OPINION OF THE COURT
Hugh R. Elwyn, J.
Jonathan Lehr, the putative father of a child named Jessica, who is the subject of this adoption proceeding, has by an order to show cause signed by a Family Court Judge of Westchester County moved for an order pursuant to section 114 of the Domestic Relations Law opening, vacating and/or setting aside an order of adoption entered in the Ulster County Family Court on March 7, 1979 on the ground of fraud and other sufficient cause and upon the grounds that sections 111 and 111-a of the Domestic Relations Law are unconstitutional in that they deny due process of law and equal protection of the law; and for a further order pursuant to section 114 of the Domestic Relations Law permitting the movant to inspect the sealed records of this court.
CHRONOLOGY OF THE PRIOR LEGAL PROCEEDINGS
On or about December 21, 1978 Richard N. Robertson and Lorraine Robertson, his wife, filed a petition with this court for the adoption by Richard Robertson of Jessica Martz, his wife’s natural child who was born out of wedlock on November 9, 1976.
*105 Without notice to Jonathan Lehr, the child’s putative father, who did not fall within any of the seven categories of fathers of children born out of wedlock enumerated in section 111-a (subd 2, pars [a]-[g]) of the Domestic Relations Law as persons entitled to notice of an adoption proceeding involving a child born out of wedlock, an adoption hearing was routinely scheduled to be held in this court on January 15, 1979. On that day such a hearing was held at which the only two witnesses were Richard N. Robertson, the adoptive father, and Lorraine Robertson, the child’s natural mother, who in accordance with the requirements of section 111 (subd 1, par [c]) of the Domestic Relations Law readily gave her consent to her husband’s application for the adoption of her out-of-wedlock child. The inquiry at the hearing was conducted entirely by the court and the sworn testimony of Mr. and Mrs. Robertson merely confirmed the contents of their petition which contained all of the information required to be included by subdivision 2 of section 112 of the Domestic Relations Law. In addition thereto, the natural mother submitted an affidavit in which she confirmed that there was no person who was entitled to notice of the proceedings pursuant to section 111-a of the Domestic Relations Law.
At the conclusion of the hearing the court routinely made an order designating the Ulster County Department of Social Services as the authorized agency to make the investigation required by section 116 of the Domestic Relations Law. Such an investigation was conducted by the Ulster County Department of Social Services and a written report of their investigation was received by the court on February 26, 1979. The report of investigation concerned itself with the natural mother and the adoptive father and the child; no contact was made with the putative father who is not identified in the report.
Although unknown to this court at the time, it now appears that on January 30, 1979, Jonathan Lehr, the putative father, filed in the Westchester County Family Court a paternity petition seeking to have himself declared to be the father of Jessica and to be awarded reasonable rights of visitation. A summons directed to Lorraine Robertson was issued by the Westchester County Family Court three weeks later on February 21, 1979 and was personally served upon her on February 22, 1979. The following Monday, February 26, counsel for Mrs. Robertson informed the court of the pendency of the West- *106 Chester County Family Court filiation proceeding and on the same day at the behest of counsel for Mrs. Robertson the court signed an order to show cause for a change of venue of the filiation proceeding returnable on March 12, 1979 before the Family Court of Westchester County. It was in this manner and at this time, February 26, 1979, that this court first learned of the putative father’s asserted interest in the child, Jessica.
The motion for a change of venue was opposed by the putative father and was denied by the Family Court of Westchester County. Although the court concedes that through having signed an order to show cause for a change of venue it was aware of the pendency of the Westchester County filiation proceeding, the court nevertheless on March 7, 1979 at the behest of counsel for the adoptive parent signed a final order of adoption. On the same day, but after the order of adoption had been signed, counsel for the putative father telephoned the court to request a delay in the adoption proceeding and was informed by the court that his request came too late; the order of adoption had already been signed.
It is important to note that at the date of signing the order of adoption, the adoptive parent had complied with every requirement of article 7 of the Domestic Relations Law; there was no person who qualified as a person entitled to notice of the proceeding under the provisions of section 111-a of the Domestic Relations Law; the court had received the Department of Social Services report of its investigation as required by section 116 of the Domestic Relations Law and their report of the adoptive parent was in all respects favorable. From the information I had before me I was completely satisfied that the best interests of the child would be promoted by approving the adoption. That being the case, the court was of the opinion that it had no alternative but to approve the adoption, for it is provided in section 114 of the Domestic Relations Law that "[i]f satisfied that the best interests of the adoptive child will be promoted thereby the judge or surrogate shall make an order approving the adoption”. The language of the statute is mandatory. Aside from knowledge of the putative father’s belated assertion of his fatherhood in an independent proceeding in another court[1] months after this proceeding had been *107 commenced, there certainly was no reason known to the court for disapproving the adoption.
Now by order to show cause initiated nearly four months after the adoption order was signed the putative father seeks to vacate the order of adoption because he was not given notice of the proceeding and upon the further ground that both sections 111 and 111-a of the Domestic Relations Law are unconstitutional.
THE PUTATIVE FATHER’S ARGUMENT WITH RESPECT TO LACK OF NOTICE
The putative father concedes that he does not fall within any of the seven categories of putative fathers entitled to notice of an adoption proceeding involving a child born out of wedlock enumerated in section 111-a (subd 1, pars [a]-[g]) of the Domestic Relations Law. He is not named as the father on the child’s birth certificate (Domestic Relations Law, § 111-a, subd 2, par [d]), nor has he ever filed a notice of intent to claim paternity of the child with the putative father registry (Domestic Relations Law, § 111-a, subd 2, par [c]). Hence there was no statutory duty on the part of either the petitioner or the court at the time the proceeding was commenced to have given him notice of the proceeding.
The putative father argues, however, that since the mother of the child knew of his identity and that during the pendency of this proceeding and before its consummation with the signing of an order of adoption on March 7, 1979 she acquired actual notice of his asserted claim to the paternity of her child through his institution of a paternity proceeding in the Family Court of Westchester County in which she was named as the respondent, the constructive notice of the putative father’s interest in his out-of-wedlock child provided by section 111-a of the Domestic Relations Law became irrelevant.
The court’s research has revealed no reported case construing section 111-a of the Domestic Relations Law dealing with the court’s responsibility to require a petitioner in an adoption proceeding involving an out-of-wedlock child where the mother has actual notice, as opposed to the constructive notice of a putative father’s potential interest in the proceeding provided by section 111-a of the Domestic Relations Law. The question arises whether there may possibly be some valid analogy with the well-settled construction of the real property recording act (Real Property Law, § 291) that one cannot *108 claim to be a purchaser in good faith and for value if one has actual notice of an asserted legal ownership, interest in or lien upon real property even though the legal instrument which is the basis for the title or right is unrecorded. "[T]he Recording Acts serve only as constructive notice and where actual notice exists lose all pertinence. Real Prop. Law, § 291.” (Reed v Barkley, 123 Misc 635, 637.)
The validity of this analogy is challenged by counsel for the adoptive father and natural mother who points out that the court’s duty to require notice of an adoption proceeding involving an out-of-wedlock child is one imposed by statute (Domestic Relations Law, § 111-a); the putative father here did not qualify as a father entitled to notice under section 111-a and that the court was under no duty to require the petitioner to give a notice not required by the statute. Furthermore, it is pointed out that although known to the Greek and Roman law, adoption was unknown to the common law and exists in this country only by virtue of statute. In this State an adoption can be consummated only under the conditions prescribed by statutory authority and like all statutory proceedings there must be strict observance of the statute (Matter of Fitzsimmons v Liuni, 51 Misc 2d 96, 112-113 and cases there cited, revd on other grounds 26 AD2d 980).
As Judge (later Chief Judge) Desmond observed in Matter of Eaton (305 NY 162, 165): "On few questions is decisional law so clear as on this: that adoption, and the abrogration thereof, is, in New York, solely the creature of, and regulated by, statute law.”
In this case all provisions of article 7 of the Domestic Relations Law relating to private placement adoptions were strictly complied with; it is not even contended that there were any omissions or shortcuts taken (see, e.g., Matter of Santacose, 271 App Div 11). Rather, the putative father’s complaint is that there was a failure on the part of the court to do more than the statute required, i.e., require the petitioner to give notice to the putative father of the pendency of this adoption proceeding when it became known to the mother and through her to this court of his interest in the child because of his assertion of parentage in the paternity proceeding he had instituted in another court.[2] In short, it is *109 charged that the court was remiss in its duty in not requiring the petitioning adoptive parent to do more than the statute (Domestic Relations Law, § 111-a) required.
In support of this contention, counsel for the putative father cites Matter of Lord (28 AD2d 1203) in which on a motion similar to the instant one the Appellate Division (4th Dept) reversed a Family Court order which had denied a motion to vacate an order of adoption. Although the appellate court in Lord (supra, p 1203) thought "it * * * inconceivable that the court would not have directed that notice be given to all interested parties beyond that required by the bare necessities of the statute” where there had been a failure to disclose in an open manner certain material facts as to the previous custody of the child, the factual situation in Lord (supra) is readily distinguishable from the facts of the present case.
In Lord (supra) there was a considerable factual dispute as to who had the custody of the child. Any person having lawful custody of the adoptive child is a necessary party to an adoption proceeding (Domestic Relations Law, § 111, subd 1, par [d]). If the appellant was correct on the issue of who had the lawful custody of the child, then by reason of the statute he was entitled to have been put on notice of the adoption proceeding. In this case, assuming arguendo, the truth of all of the putative father’s factual assertions, he still is not entitled to notice under section 111-a of the Domestic Relations Law. Accordingly, I do not find the decision in Matter of Lord (supra) apposite to the situation presented on this motion.
Moreover, the court notes that Matter of Lord (supra) was decided in 1967, some nine years before the enactment of section 111-a of the Domestic Relations Law in 1976 and has nothing to do with the problem section 111-a of the Domestic Relations Law was enacted to meet. This statute, as is noted in the discussion of its constitutionality, was enacted in direct response to the United States Supreme Court decision in Stanley v Illinois (405 US 645) in order to remove any doubt as to which putative fathers were entitled to notice of an adoption proceeding involving an out-of-wedlock child. The statute does not purport to give the court any discretion to add to the list.
Jonathan Lehr’s right to notice of this adoption proceeding, if any, has to be founded not upon section 111-a of the Domestic Relations Law, but upon subdivision 3 of section 111 of the Domestic Relations Law which does purport to give the *110 court discretion in the matter of who is entitled to notice and an opportunity to be heard in an adoption proceeding. Subdivision 3 of section 111 of the Domestic Relations Law provides that: "Notice of the proposed adoption shall be given in such manner as the judge or surrogate may direct and an opportunity to be heard thereon may be afforded * * * to any other parent whose consent to adoption may not be required pursuant to subdivision two [of section 111 of the Domestic Relations Law], if the judge or surrogate so orders”.
It should be noted that subdivision 3 of section 111 of the Domestic Relations Law has been a part of the law of this State since the enactment of section 111 of the Domestic Relations Law in 1938, a period of more than 40 years. In other words, the discretionary authority given to the Judge or Surrogate to require notice of an adoption proceeding to be given "to any other parent whose consent to adoption may not be required” (Domestic Relations Law, § 111, subd 3) antedated the United States Supreme Court decision in Stanley v Illinois (405 US 645, supra) and the later enactment in 1976 of section 111-a of the Domestic Relations Law by almost 40 years. Although the phrase "any other parent whose consent to adoption may not be required” could be construed broadly enough to include the father of an out-of-wedlock child as well as a father whose consent might not be required by reason of abandonment, surrender or loss of civil rights or mental illness (Domestic Relations Law, § 111, subd 2), it could hardly have been the intention of the Legislature to require such a notice to be given to a father whose consent was not required by New York Law (Domestic Relations Law, § 111, subd 1, par [c]) and whose consent was not constitutionally required (Matter of Malpica-Orsini, 36 NY2d 568) until April 24, 1979 when the United States Supreme Court rendered its decision in Caban v Mohammed (441 US 380).
At no time prior to this motion did the putative father of the child attempt to intervene in the proceeding as he might have done pursuant to CPLR 401 nor has he ever asked this court to exercise its discretion to give him notice of the proceeding and an opportunity to be heard, which conceivably the court might have done under the broad language of subdivision 3 of section 111 of the Domestic Relations Law. As a practical matter, however, the court can perceive of no reason why it should, on its own motion, have exercised its discretion to require that a notice of a proposed adoption and *111 an opportunity to be heard be given to a man claiming to be the father of an out-of-wedlock child who did not qualify as a person entitled to notice of the proceeding under section 111-a of the Domestic Relations Law and whose consent to the adoption was not legally required (Domestic Relations Law, § 111, subd 1, par [c]; Matter of Malpica-Orsini, 36 NY2d 568, supra). Unless and until an appellate court holds that this court abused its discretion in not requiring that notice of the adoption proceeding be given to the putative father in this case under the broad provisions of subdivision 3 of section 111 of the Domestic Relations Law when not required under the more specific statute governing notice to out-of-wedlock fathers (Domestic Relations Law, § 111-a) this court adheres to its initial judgment — that no notice of this adoption proceeding was required to be given to a putative father who did not qualify under any of the provisions of section 111-a of the Domestic Relations Law.
THE RESPONSIBILITY OF THE MOTHER AND ADOPTIVE FATHER TO THE PUTATIVE FATHER
From the chronology of events heretofore recited it is clear that the mother, Lorraine Robertson, knew of the putative father’s assertion, through legal proceedings, of his claim to be the father of her child nearly two weeks before the adoption order was signed.[3] Since the mother must have known of his claim to the fatherhood of her child since birth, or perhaps even from the moment of conception, the question arises — of what legal significance is it that she was apprised some two weeks before the adoption of her child was finalized, of the putative father’s decision to seek a judicial determination of a fact she must have known all along? The court acknowledges that it learned of the pendency of the Westchester County filiation proceeding on February 26, 1979, at the behest of counsel for the mother, it signed an order to show cause for a change of venue.[4] What is not clear from the motion papers, which are entirely silent on this point, is *112 whether or not Mrs. Robertson’s husband, the adoptive parent, had any actual or imputed knowledge of the putative father’s claim to the fatherhood of the child.
Although much is made of the fact that the mother had actual notice of the putative father’s claim to the parentage of her child before the adoption proceeding was consummated, the only significant inquiry is whether or not the adoptive father knew of the asserted claim for he is the petitioner and the only real party in interest.[5] 6 In the absence of any proof of actual notice, the basis for imputing such knowledge to him its tenuous at best. There is no claim of any agency existing between husband and wife to form the basis of imputing the knowledge of the agent to the principal. Any basis for the imputation of the wife’s knowledge to the husband has to rest upon the marital relationship alone which is wholly insufficient.
It is extremely doubtful, however, whether the adoptive father, the only real party in interest in this proceeding, can be charged with the legal consequences of having actual or imputed knowledge of the putative father’s claim which is asserted in another court in a litigation to which he is not a party. Although the rights of putative fathers have recently been greatly expanded through recent decisions of the United States Supreme Court (see, e.g., Stanley v Illinois, 405 US 645, supra; Caban v Mohammed, 441 US 380, supra) and by statute (see recent amdt to Family Ct Act, § 522, L 1976, ch 665, § 6, eff Jan. 1, 1977) permitting fathers as well as mothers to institute paternity proceedings and which was utilized in this case, it still must be remembered that the real purpose of a paternity proceeding is to enforce the putative father’s financial responsibility for the support of the child he has fathered. The mother’s husband is neither a proper nor necessary party to the proceeding and is in no way bound by the result. In this connection it may be well to recall the language of the Court of Appeals in Commissioner of Public Welfare of City of N. F. v Koehler (284 NY 260, 266-267) where the court said: "Paternity proceedings are brought to enforce a statutory duty *113 imposed upon the father of a natural child to whom the father at common law owéd no duty. (People ex rel. Lawton v. Snell, 216 N. Y. 527.) * * * The child is not a necessary party to the proceedings nor is the husband of the mother. The order made in such a proceeding does not constitute an adjudication binding on them or persons claiming through or under them that the child is or is not the legitimate offspring of married parents. An order adjudging that some person other than the mother’s husband is the father of the child and ordering him to provide for its support is, it is plain, not a binding adjudication of illegitimacy. It does not establish the status of the child nor would it be competent evidence to establish illegitimacy in any proceeding to which others are parties.” (See, also, Matter of Salvatore S. v Anthony S., 58 AD2d 867; cf. Matter of Commissioner of Social Servs. of City of N. Y. v Lazaro F., 99 Misc 2d 408.)
If the mother’s husband, the adoptive parent here, is in no way bound by any adjudication that might be made in the putative father’s paternity proceeding, it is difficult to see how he can be charged with the legal consequences of knowledge, actual or imputed, of the putative father’s asserted claim to fatherhood of a child which has never even been adjudicated. In short, it seems to me that the adoptive father’s knowledge, if any, of the putative father’s claim asserted by way of the Westchester County filiation proceeding is without legal significance. The same is true for the mother’s knowledge of the putative father’s asserted claim to be the father of her child, for she cannot be charged with any legal duty beyond that of complying with the law of the State of New York as embodied in its statutes which, under the circumstances of this case, did not require the giving of any notice of the proceeding to the putative father. In sum, it seems to me that since the statute (Domestic Relations Law, § 111-a) did not require any notice to be given of this adoption proceeding that both the mother or the adoptive father’s knowledge of the putative father’s claim to the parentage of this child is irrelevant and without legal significance. That being the case neither the mother nor the adoptive father can be charged with committing any fraud upon the court for failing to do that which the law clearly did not require them to do.
While the court does have jurisdiction to "open, vacate or set aside [an] order of adoption for fraud, newly discovered evidence or other sufficient cause” (Domestic Relations Law, *114 § 114; Matter of Natural Parents of "Nicky" v Dumpson, 81 Misc 2d 132, 141), "the fraud which will suffice to vacate an order or judgment must be fraud in the very means by which the judgment was procured (Fuhrmann v. Fanroth, 254 N. Y. 479). 'The fraud must relate to matters other than the issues which could have been resolved in the action wherein the judgment was obtained and must be a fraud upon the court as distinguished from fraud between the parties.’ (J. J. Miller Constr. Co. v. Berlanti Constr. Co., 197 N. Y. S. 2d 818, 819-820; see, also, Matter of Brundage, 137 N. Y. S. 2d 703, 710.)” (Matter of Anonymous, 29 Misc 2d 580, 582; see, also, Matter of Natural Parents of "Nicky" v Dumpson, 81 Misc 2d 132, 141, 143, supra.)
The putative father may feel himself to be aggrieved by the mother’s failure to disclose to the court the full extent of their relationship, but since such information is irrelevant to the court’s decision to approve this adoption as being in the best interests of the child, the mother’s withholding of this information does not constitute a fraud upon the court. The mother’s failure to disclose to the court the nature and extent of her relationship with the putative father furnishes no legal ground for vacating and setting aside this order of adoption. The motion to vacate the order of adoption for the fraud of the mother is denied.
A consummated adoption is unassailable. (People ex rel. McGaffin v Family & Children’s Serv. of Albany, 2 Misc 2d 608, mod 3 AD2d 633; see, also, McGaffin v Family & Children’s Serv. of Albany, 6 Misc 2d 776, citing People ex rel. Grament v Free Synagogue Child Adoption Committee, 194 Misc 332, 336, mot to dismiss opp granted 275 App Div 823.)
EXTENT OF THE COURT’S OBLIGATION TO REQUIRE AN INVESTIGATION INTO THE SOCIAL HISTORY OF THE MOTHER AND THE PUTATIVE FATHER
The attorney for the putative father contends that before approving this adoption the court should have required the Department of Social Services to have made a more thorough investigation than it did and that had such a thorough and in-depth investigation been made certain derogatory information regarding the mother’s emotional instability would have been revealed which might have had a critical impact on the court’s decision. Moreover, such an investigation, if had, would, it is said, have revealed the details of the putative *115 father’s relationship with the child’s mother and demonstrated his interest in the child. In short, the attorney for the putative father seems to be charging the court with a failure to discharge its full responsibility under the provisions of section 116 of the Domestic Relations Law.
In answer to this contention it should first be noted that although the investigation required by subdivision 3 of section 116 of the Domestic Relations Law is by the wording of the statute not limited to securing information concerning the areas delineated in section 116 (subd 3, pars [a]-[f]) of the Domestic Relations Law, all of the areas the investigation is required to cover concern the adoptive parents and the adoptive child. No mention at all is made of the natural mother or the putative father of a child born out of wedlock.
Quite frankly, even if a thorough and complete investigation into the illicit relationship between the mother and the putative father which resulted in the conception and birth of this child were made and certain unfavorable information concerning the mother’s mental and emotional instability were revealed, it is difficult to see how such information, no matter how derogatory, could in any way be significant or even relevant to the court’s decision as to whether or not the stepfather’s application for the adoption of this child should have been approved or disapproved. In spite of anything the investigation might have revealed about the child’s mother, she would still have remained the child’s mother, for better or for worse. Her only role in the adoption proceeding, as I see it, is for her to decide whether to grant or withhold her consent to the adoption of her out-of-wedlock child. Without her consent the adoption cannot take place (Domestic Relations Law, § 111, subd 1, par [c]). With it, the adoption may be approved if the court is satisfied that it is in the child’s best interest to do so (Domestic Relations Law, § 114). It is with the character and fitness of the adoptive parent that the court is primarily concerned. The illicit love affair between the mother and the putative father which resulted in the conception and birth of the child is, or should be, of little concern to the court.
CONSTITUTIONALITY OF SECTION 111 OF THE DOMESTIC RELATIONS LAW
The United States Supreme Court decision in Caban v Mohammed (441 US 380, supra), overruling the New York *116 Court of Appeals decision in Malpica-Orsini (36 NY2d 568, supra) has declared section 111 of Domestic Relations Law, insofar as it requires the consent of only the mother of an out-of-wedlock child to its adoption, unconstitutional. For this court any question as to the constitutionality of section 111 of the Domestic Relations Law is foreclosed by the decision of the United States Supreme Court.
CONSTITUTIONALITY OF SECTION 111-A OF THE DOMESTIC RELATIONS LAW
Because section 111-a of the Domestic Relations Law, which was enacted by the New York State Legislature in response to the United States Supreme Court decision in Stanley v Illinois (405 US 645, supra), requires that notice of an adoption proceeding involving an out-of-wedlock child be given to seven enumerated categories of putative fathers, but does not require that a notice of the proceeding be given to all putative fathers, it is claimed that the statute discriminates against some putative fathers including the father of Jessica, thereby making an arbitrary and hence invalid classification of putative fathers which has denied Jonathan Lehr due process and the equal protection of the law.
The contention will not withstand analysis and is without merit. Legislative classification does not render a statute unconstitutional provided the classification is rational and reasonable and not purely arbitrary and is related to a legitimate state function. "It is fundamental, of course, that the Legislature may classify persons for purposes of legislation without infringement of the equal protection guarantee and that its discretion in this regard is broad and will not be disturbed if any state of facts can reasonably be conceived to sustain its classification (Matter of 436 W. 34th St. Corp. v. McGoldrick, 288 N. Y. 346, 350, mot. for rearg. den. 289 N. Y. 673; Shielcrawt v. Moffett, 49 N. Y. S. 2d 64, 76, affd. 268 App. Div. 352, revd. on other grounds 294 N. Y. 180, mot. for rearg. den. 294 N. Y. 840; New York R. T. Corp. v. City of New York, 303 U. S. 573) or even if the classification be fairly debatable (Matter of Presnell v. Leslie, 3 N. Y. 2d 384, 390, mot. for rearg. den. 4 N. Y. 2d 1046), provided only it shall not be palpably arbitrary (New York ex rel. Bryant v. Zimmerman, 278 U. S. 63).” (Matter of Dorn "HH” v Lawrence "II”, 31 NY2d 154, 158, app dsmd 409 US 1121.)
In its report to the Governor and the Legislature of the *117 State of New York, dated October, 1976 the Temporary State Commission on Child Welfare of which Senator Joseph R. Pisani was chairman, explains the need for legislation to dispel the confusion arising from the absence of clear statutory guidelines in the wake of the United States Supreme Court decision in Stanley v Illinois (405 US 645, supra) and the New York Court of Appeals decision in Matter of Malpica-Orsini (36 NY2d 568, opp dsmd by the US Supreme Ct "for want of substantial federal question” 423 US 1042, supra). The commission explains the purpose of section 111-a of the Domestic Relations Law (L 1976, ch 665) as follows:
"This measure will dispel uncertainties by providing clear constitutional statutory guidelines for notice to fathers of out-of-wedlock children. It will establish a desired finality in adoption proceedings and will provide an expeditious method for child placement agencies of identifying those fathers who are entitled to notice through the creation of a registry of such fathers within the State Department of Social Services. Conversely, the bill will afford to concerned fathers of out-of-wedlock children a simple means of expressing their interest and protecting their rights to be notified and have an opportunity to be heard. It will also obviate an existing disparity of Appellate Division decisions by permitting such fathers to be petitioners in paternity proceedings.
"The measure is intended to codify the minimum protections for the putative father which Stanley would require. In so doing it reflects policy decisions to (a) codify constitutional requirements, (b) clearly establish, as early as possible in a child’s life, the rights, interests and obligations of all parties; (c) facilitate prompt planning for the future of the child and permanence of his status; and (d) through the foregoing, promote the best interests of children.”
The memorandum in support of the bill to add new sections 384-c and 372-c to the Social Services Law and a new section 111-a to the Domestic Relations Law and amending section 254 of the Judiciary Law and numerous sections of article 5 of the Family Court Act points out that despite the Court of Appeals decision in Matter of Malpica-Orsini (supra), "there still exists uncertainty as to the significance of the Stanley decision with respect to: (a) which fathers of out-of-wedlock children are entitled to notice; (b) in which proceedings; (c) what sort of search, if any, is required in order to ascertain the identity and location of putative fathers. This bill would *118 dispel uncertainties by providing clear constitutional statutory guidelines for notice to putative fathers(NY Legis Ann, 1976, p 258; emphasis supplied.) In addition, "[i]t would establish much desired finality in adoption proceedings, and would provide an expeditious method for child placement agencies to ascertain those fathers who are entitled to notice. Conversely, the bill would afford to concerned fathers of out-of-wedlock children a simple means of expressing their interest and protecting their rights to notice and an opportunity to be heard” (NY Legis Ann, 1976, p 258).
In view of this legislative history of section 111-a of the Domestic Relations Law[6] it is clear to this court that the State of New York had a legitimate State interest in enacting section 111-a of the Domestic Relations Law and in establishing a putative father registry (Social Services Law, § 372-c); that its classification of putative fathers is rational and reasonable and clearly is not palpably arbitrary. I therefore find no unconstitutional infirmity in the statute.
Even if this court had any serious doubt as to the constitutionality of section 111-a of the Domestic Relations Law, which it does not, there are at least three additional reasons why this court, a court of first instance, should not find the statute unconstitutional.
First, "It is a cardinal tenet of our law that constitutional questions should not be reached unless there is need for their determination to resolve the issue at hand and the question is squarely presented (Comiskey v Arlen, 43 NY2d 696; Matter of Peters v New York City Housing Auth., 307 NY 519; Anti-Fascist Committee v McGrath, 341 US 123).” (Matter of Dora P., 68 AD2d 719, 729). Here as in Dora P. (supra), no such need exists, nor, indeed is the issue presented for even if the court were gratuitously to find section 111-a of the Domestic Relations Law unconstitutional the putative father in this case would not benefit from such a finding. This court will not make the error of reaching out to come to grips with a problem which is not before it (see Matter of Dora P., supra, pp 729-730).
Secondly, there is the matter of standing. The putative father in this case does not bring himself within any of the classifications of putative fathers who are affected by the *119 statute. "The constitutionality of a statute is to be considered in the light of the standing of the party who seeks to raise the question and of its particular application. * * * It is firmly established that the constitutionality of a statute may not be attacked by one whose rights are not, or are not about to be, adversely affected by the operation of the statute. * * * To raise the question he must show that the alleged unconstitutional feature of the statute injures him, and so operates as to deprive him of a constitutional right. * * * It is, of course, a prerequisite that he establish in himself the claimed right which is alleged to be infringed. * * * A person ordinarily is precluded from challenging the constitutionality of statutes invoking the rights of others. * * * It must affirmatively appear that the person attacking the statute comes within the class of persons affected by it.” (United States v Herrera, 584 F2d 1137, 1148.)
As in Herrera (supra) the putative father of this child thus lacks standing to attack the statute vicariously by asserting grounds not personal to him, since he does not bring himself within any of the classes of putative fathers affected by the statute. The fact that he is omitted from its coverage does not deny to him the equal protection of the law.
Finally, a finding of unconstitutionality should not be lightly undertaken by courts of first instance. "A statute should not ordinarily be set aside as unconstitutional by a court of original jurisdiction unless such conclusion is inescapable. Courts of first instance should not exercise transcendent power of declaring an act of the Legislature unconstitutional except in rare cases involving life and liberty, and where the invalidity of the act is apparent on its face.” (McKinney’s Cons Laws of NY, Book 1, Statutes, § 150, and authorities there cited; see, e.g., Comiskey v Arlen, 55 AD2d 304, affd 43 NY2d 696; Bohling v Corsi, 204 Misc 778, 783; affd 306 NY 815.) The tendency is to leave such questions to appellate tribunals (City of New Rochelle v Echo Bay Waterfront Corp., 182 Misc 176, 177, affd 268 App Div 182, affd 294 NY 678). Even intermediate appellate courts sometimes defer to higher appellate courts (Matter of Excelsior Pictures Corp. v Regents of Univ. of State of N. Y., 2 AD2d 941). "There is a strong presumption that a statute duly enacted by the Legislature is constitutional” (People v Pagnotta, 25 NY2d 333, 337).
Consequently, although this court is of the opinion that the Legislature’s classification of those putative fathers entitled to *120 notice of an adoption proceeding affecting out-of-wedlock children into seven classes does not deny to Jonathan Lehr the equal protection of the laws, the court for the reasons stated above declines to pass upon the constitutionality of section 111-a of the Domestic Relations Law.
RETROACTIVE APPLICATION OF CABAN V MOHAMMED
The final order of adoption in this matter was signed on March 7, 1979. On April 24, 1979 the United States Supreme Court rendered its decision in Caban v Mohammed (441 US 380, supra) holding section 111 of the Domestic Relations Law unconstitutional insofar as it requires only the mother’s consent to the adoption of an out-of-wedlock child.
The majority opinion of the court is silent with respect to its retroactive application. The only clue as the decision’s retroactive application is found in the dissenting opinions. In a dissenting opinion, in which Chief Justice Burger and Mr. Justice Rehnquist joined, Mr. Justice Stevens said: "The adoption decrees that have been entered without the consent of the natural father must number in the millions. An untold number of family and financial decisions have been made in reliance on the validity of those decrees. Because the Court has crossed a new constitutional frontier with today’s decision, those reliance interests unquestionably foreclose retroactive application of this ruling. See Chevron Oil Co. v. Huson, 404 U. S. 97, 106-107. Families that include adopted children need have no concern about the probable impact of this case on their familial security.” (Caban v Mohammed, supra, pp 415-416 [dissenting opn of Mr. Justice Stevens].)
Mr. Justice Stewart concurred, saying, "I agree that retroactive application of the Court’s decision today would work untold harm, and I fully subscribe to Part III of Mr. justice stevens’ dissent” (Caban v Mohammed, supra, p 401 [dissenting opn of Mr. Justice Stewart]).
Moreover, as noted (p 416) by Mr. Justice Stevens, "as I read the Court’s opinion, the statutes now in effect may be enforced as usual unless 'the adoption of an older child is sought,’ ante, at 392, and 'the father has established a substantial relationship with the child and [is willing to admit] his paternity.’ Ante, at 393”. Here neither of these conditions prevail.
The Caban majority did not object to the statement of the *121 dissenting Judges with respect to their statements regarding the decision’s retroactive application, although they did to other portions of the dissent (see, e.g., 441 US, at p 388, n 6). It may be argued that they thus, at least tacitly, concurred in it.
On the other hand, it is the majority opinion which prevails and constitutes the law of the land. As previously noted the majority opinion is silent on the retroactive application of its decision.
Some clue to the retroactive application of Caban (supra) may be gleaned from the history of one case in the light of the New York Court of Appeals decision in Matter of Malpica-Orsini (36 NY2d 568, supra) which upheld the constitutionality of section 111 of the Domestic Relations Law (May 8, 1975).
In February, 1977 the Appellate Division (2nd Dept) decided Matter of David A. C. and Matter of Denise C. (56 AD2d 627) and on the authority of Matter of Malpica-Orsini (36 NY2d 568, supra) affirmed a Surrogate’s order of adoption over the objection of a putative father who had not given his consent thereto.
On November 17, 1977 the Court of Appeals dismissed the appeal in Matter of David A. C. (43 NY2d 708, 709, reported below 56 AD2d 627) saying: "The purportedly direct and dispositve constitutional issues underlying this appeal are not more than a restatement of questions whose merit has been clearly resolved against appellant’s position (Matter of Malpica-Orsini, 36 NY2d 568, opp dsmd sub nom. Orsini v Blasi, 423 US 1042)”.
Thereafter, and on April 24, 1979 the United States Supreme Court decided Caban v Mohammed (supra), holding section 111 of the Domestic Relations Law unconstitutional insofar as it requires only the consent of a mother to the adoption of an out-of-wedlock child.
On June 12, 1979, the Court of Appeals reversed Matter of David A. C. (56 AD2d 627, supra) and Matter of Denise C. (56 AD2d 627, supra) in a one sentence opinion (47 NY2d 880) saying: "Upon reargument, following remand by the United States Supreme Court, order reversed, without costs, orders of adoption vacated, and matters remitted to the Surrogate’s Court, Kings County, for further consideration not inconsistent with the opinion of the Supreme Court (Caban v Mohammed, 441 US 380, 47 USLW 4462).”
*122 Here is a plain retroactive application of Caban (supra) to an adoption which had been consummated without a putative father’s consent on the basis of section 111 of the Domestic Relations Law which was subsequently affirmed by the Appellate Division and the Court of Appeals on the authority of Matter of Malpica-Orsini (36 NY2d 568, supra). Then along comes Caban (supra) and the orders of adoption are vacated (Matter of David A. C., 47 NY2d 880, supra). The question arises — Where does all of this leave the order of adoption in this case, which was made on March 7, 1979, seven weeks before Caban was decided on April 24, 1979?
The Court of Appeals decision in Matter of David A. C. and Matter of Denise C. (47 NY2d 880, supra) is authority for the retroactive application of Caban (supra). However, there is one important difference to be noted between the adoptions of Matter of David A. C. and Matter of Denise C. (supra) and this case. In the reported case, the putative father appears to have been a party to the litigation and to have raised in the Surrogate’s Court the question of the constitutionality of section 111 of the Domestic Relations Law as having denied to him the same rights as to the approval of the adoption as were enjoyed by the child’s mother, for he was the appellant on all of the appeals. Here the adoption had been consummated without the putative father’s participation in the adoption proceeding; only after the adoption has been consummated and the order of adoption signed does he, now that the United States Supreme Court has decided Caban (supra), raise the issue of the constitutionality of section 111 of the Domestic Relations Law as applied to him. There is a significant difference between this case and Matter of David A. C. and Matter of Denise C. (supra) which, in my judgment, warrants a denial of retroactive application of the Caban decision (supra) to this case. The movant is a "Johnny come lately” whose application simply comes too late.
Moreover, the trauma that would be inflicted upon the child, the mother and the adoptive father in this case argues strongly and persuasively against any retroactive application of the Caban decision (441 US 380, supra) to this adoption. Accordingly, Caban will not be given retroactive application, and the order of adoption will not be vacated because of Caban (supra).
INSPECTION OF THE SEALED RECORDS OF THE COURT
"No person shall be allowed access to such sealed records *123 and order and any index thereof except upon an order of a judge or surrogate of the court in which the order was made or of a justice of the supreme court. No order for disclosure or access and inspection shall be granted except on good cause shown and on due notice to the adoptive parents and to such additional persons as the court may direct.” (Domestic Relations Law, § 114.)
In light of the decision here made for reasons set forth at length, I do not find that sufficient "good cause” has been shown to permit the putative father, whose "standing” is doubtful and precarious at best, to have access to the sealed records of this consummated adoption. Accordingly, the petitioner’s application to be permitted access to the records of this adoption is denied.

. The putative father was never a party to the adoption proceeding and never sought to intervene, as he might have done pursuant to CPLR 401, 1012 (subd [a]) and 1013.

. The mother acknowledges being served with a summons issued in the paternity proceeding in Westchester County Family Court on February 22, 1979. The order of adoption was signed on March 7, 1979.

. The mother acknowledges being served with a summons in the paternity proceeding in Westchester County Family Court on February 22, 1979. The order of adoption was signed on March 7,1979.

. The court never had any direct communication from counsel for the putative father relative to his interest in the pending proceeding until the morning of March 7, 1979 when it received a telephone call from counsel asking that the adoption proceeding be stayed. The order of adoption had, however, already been signed.

. The mother, although named in the papers on file in this proceeding as a petitioner along with her husband and referred to in the order as the "adoptive mother”, is not really a party to this proceeding. Her role in the matter is confined to giving her consent to the adoption by her husband of her out-of-wedlock child as she is required to do by section 111 (subd 1, par [c]) of the Domestic Relations Law. She cannot be transformed from a natural mother to an adoptive mother by some legal alchemy peculiar to an adoption proceeding.

. The court acknowledges its indebtedness to the office of the New York State Attorney-General for supplying a complete legislative history of section 111-a of the Domestic Relations Law.