**Gladys Fay WELLS, Guardian ad litem for Dennis Edgar Wells, Jr., a minor over the age of 14 years, Plaintiffs and Respondents,**

v.

**CHILDREN'S AID SOCIETY OF UTAH, Successor in Custody of K.B., Mother of Infant B., and K.B., Defendants and Appellants,**

v.

**John DOE and Mary Doe and Robert D. Maack, Esq., Guardian ad litem for Infant B., Intervenors and Appellants.**

No. 18537.

Supreme Court of Utah.

March 23, 1984.

 

six days earlier, she had traveled from Moab to Ogden, where the child was born September 23, 1981. She had previously arranged with appellant Children's Aid Society, a licensed agency, to receive the child for adoption immediately after its birth.

On September 24, K.B. signed the consent and release that placed the child in the custody of Children's Aid. On September 23, 24, 25, and 28, representatives of Children's Aid contacted the office of the registrar of Vital Statistics in the Department of Health by telephone to determine whether an acknowledgment of paternity form had been filed regarding the child. They were informed each time that no form had been received. On September 25, Children's Aid placed the child, Infant B., in the home of intervenors John and Mary Doe for purposes of adoption. On September 28, the Department of Health issued its official certificate of search verifying that no acknowledgment of paternity had been filed. This certificate assured both Children's Aid and the adoptive parents that the child could be adopted without notice to the natural father.[1]

On September 30, the Department of Health notified the Children's Aid Society that they had received an acknowledgment of paternity form signed by Dennis E. Wells, Jr., the plaintiff in this case. The form arrived by mail at the Department's office in Salt Lake City on September 30 in an envelope post-marked Moab, Utah, September 23. Children's Aid took no action to alter the child's placement for adoption.

Dennis filed this action, through his guardian ad litem, on October 6, 1981, seeking custody of the child. The complaint alleged that Children's Aid and K.B. had fraudulently concealed the facts surrounding the infant's birth to deprive him of his parental rights.

The evidence at trial showed that Dennis and K.B., who were both sophomores in high school, had sexual relations in the fall of 1980, the last occurring on December 23,

Jane A. Marquardt, Salt Lake City, for K.B. & Children's Aid.

Tim W. Healy, Ogden, for John & Mary Doe.

Robert D. Maack, pro se.

Paul Gotay, Midvale, for plaintiffs and respondents.

OAKS, Justice:

This appeal involves the constitutionality of U.C.A., 1953, § 78–30–4(3), which terminates the parental rights of the father of an illegitimate child if he fails to give the required timely notice of his claim of paternity. The district court concluded that the notice requirement could not constitutionally be applied to this father because he was denied a reasonable opportunity to comply. We reverse.

K.B., a 16-year-old unmarried girl residing in Moab, gave birth to a child. About

---

1. The certificate of search is required before a court can grant a final decree of adoption; it is not a prerequisite to the placement of a child in an adoptive home. § 78–30–4(3)(d).

1980. In January of 1981, K.B. informed Dennis that she thought she was pregnant. Thereafter, he refused to speak to her and they ceased dating. K.B. did not begin dating anyone else until approximately one month later. K.B.'s pregnancy was not medically confirmed until August. At that time, K.B.'s boyfriend informed Dennis of the pregnancy, and Dennis discussed it with his parents. He never discussed the pregnancy or had any other communications with K.B.

Gladys Fay Wells, Dennis's mother, learned about the pregnancy on September 2. She immediately contacted the physician who had confirmed the pregnancy and he advised her that the probable date of birth was September 22 or 23. Mrs. Wells was very concerned about the child. On September 4, she contacted K.B. and offered financial support and help with the child's upbringing. When K.B. expressed a desire to put the child up for adoption, Mrs. Wells attempted to dissuade her. In mid-September, Mrs. Wells also contacted an attorney in Moab to determine what steps were required to obtain the child if Dennis decided to assert his parental rights. She and Dennis were informed about the need for filing an acknowledgment of paternity certificate and were instructed to obtain forms from the Department of Social Services. On September 15, Mrs. Wells met with Walter Miller, a social worker with that department, and they discussed the need for filing the certificate. Miller obtained the forms and gave them to Mrs. Wells on September 17. On September 14, Mrs. Wells and Dennis had met in Moab with Colleen Burnham of Children's Aid Society. Mrs. Wells expressed a desire to raise the child if K.B. decided to relinquish it, but Dennis, who remained mostly silent at this meeting, was equivocal, never indicating positively whether or not he desired to assert his paternal rights.

On September 17, Mrs. Wells learned that K.B. had gone to Ogden to have the baby. The baby was born on September 23, and Mrs. Wells and Dennis learned of the birth that same day. Although Dennis had signed the form on September 18, he did not mail it until September 23, the day before K.B. relinquished custody to Children's Aid. Dennis claimed that he waited to ensure that the baby was his, since if the baby had been born any later he believed that someone else would have been the father.

After a nonjury trial, the court granted custody of the child to Dennis. Although Dennis did not make a timely filing of his acknowledgment of paternity as required by § 78–30–4(3)(b), the court held that this statute could not constitutionally be applied to him because he was "denied a reasonable opportunity to file his acknowledgment of paternity prior to placement of the child by Children's Aid Society." However, judgment for Dennis was stayed pending appeal, and the infant remained with the adoptive parents.

## I. THE CONSTITUTIONAL RIGHT OF THE FATHER

■ The relationship between parent and child is protected by the federal and state constitutions. *In re J.P.*, Utah, 648 P.2d 1364 (1982). These protections include the father of an illegitimate child. *Id.* at 1374–75; *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Miller v. Miller*, 504 F.2d 1067 (9th Cir.1974). Insofar as it suggests otherwise, *Thomas v. Children's Aid Society of Ogden*, 12 Utah 2d 235, 239, 364 P.2d 1029, 1031–32 (1961), has now been overruled. Also see *State in Interest of M*, 25 Utah 2d 101, 107, 476 P.2d 1013, 1016–17 (1970) (first recognition of a "statutory parent-child relationship" in unwed father who acknowledges paternity).

■ Although parental rights have their origin in biological relationships, those relationships do not guarantee the permanency of parental rights. Constitutionally protected parental rights can be lost. They can be surrendered pursuant to statute. U.C.A., 1953, § 78–30–4(1), (2). They can be lost through abandonment of the child by "inaction or a course of conduct for which the parent is personally responsible."

*In re J. Children,* Utah, 664 P.2d 1158, 1159 (1983); § 78–30–5. Parental rights can also be terminated through parental unfitness or substantial neglect. *E.g., In re Castillo,* Utah, 632 P.2d 855 (1981).

## II. THE STATE'S INTEREST

There are special problems in defining parental rights over newborns who are illegitimate. The identity of the father may be unknown. The mother may desire to give the child up for adoption. The state has a strong interest in speedily identifying those persons who will assume the parental role over such children, not just to assure immediate and continued physical care but also to facilitate early and uninterrupted bonding of a child to its parents. The state must therefore have legal means to ascertain within a very short time of birth whether the biological parents (or either of them) are going to assert their constitutional rights and fulfill their corresponding responsibilities, or whether adoptive parents must be substituted.

■ To serve its purpose for the welfare of the child, a determination that a child can be adopted must be final as well as immediate. Thus, in rejecting a mother's attempt to recover her child about eight months after she had given it up for adoption, this Court declared:

> It is and should be the policy of the law to so operate as to encourage the finding of suitable homes and parents for children in that need. It is obvious that persons who might be willing to accept a child for adoption will be more reluctant to do so if a consenting parent is permitted to arbitrarily charge [change] her mind and revoke the consent, and thus desolate the plan of the adoptive parents and bring to naught all of their time, effort, expense and emotional involvement .... A moment's reflection will reveal that to the degree that such commitments are given respect and solidarity, so they can be relied upon, persons desiring children will be willing to accept and give them homes. Conversely, to the degree that such commitments can

easily be withdrawn and the adoptive plan thus destroyed, such persons will tend to be discouraged from doing so. *In re Adoption of F——,* 26 Utah 2d 255, 262, 488 P.2d 130, 134 (1971). *Accord Matter of S,* Utah, 572 P.2d 1370 (1977). These considerations obviously set limits to the rights of fathers as well as mothers.

■ The state's strong interest in immediate and secure adoptions for eligible newborns provides a sufficient justification for significant variations in the parental rights of unwed fathers, who, in contrast to mothers, are not automatically identified by virtue of their role in the process of birth. Relying on leading decisions in the United States Supreme Court, we have said that fathers who have "fulfilled a parental role over a considerable period of time are entitled to a high degree of protection," whereas unwed fathers "whose relationships to their children are merely biological or very attenuated" are entitled to a lesser degree of protection. *In re J.P.,* 648 P.2d at 1375.

The United States Supreme Court applied a rationale of variable parental rights in *Lehr v. Robertson,* —— U.S. ——, 103 S.Ct. 2985, 2991, 77 L.Ed.2d 614 (1983), where it referred to the fact that "the rights of the parents are a counterpart of the responsibilities they have assumed." Later in its opinion, the Court elaborated this idea and applied it to an unwed father who had no custodial, personal, or financial relationship with the infant involved in that case.

> When an unwed father demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in the rearing of his child," his interest in personal contact with his child acquires substantial protection under the due process clause.... *But the mere existence of a biological link does not merit equivalent constitutional protection.*

*Id.* 103 S.Ct. at 2993. (Emphasis added; citation omitted.) While *Lehr* involved a two-year-old rather than a newborn, it is the closest United States Supreme Court case on its facts, and its reasoning is persuasive on the issue before us.

## III.  THE STATUTE

In § 78–30–4(3), our Legislature has undertaken to resolve the competing interests of the newborn illegitimate child and the man who claims to be its father.  This statute provides a means (1) of promptly determining whether there is a man who will acknowledge paternity and assume the responsibilities of parenthood and, if not, (2) of speedily making the child available for adoption.  Subsection (a) provides:

> A person who is the father or claims to be the father of an illegitimate child may claim rights pertaining to his paternity of the child by registering with the registrar of vital statistics in the department of health, a notice of his claim of paternity of an illegitimate child and of his willingness and intent to support the child to the best of his ability.

Subsection (b) provides that the notice "may be registered prior to the birth of the child but *must be registered prior to the date the illegitimate child is relinquished or placed with an agency licensed to provide adoption services ....*"  (Emphasis added.)  Subsection (c) then provides as follows:

> Any father of such child who fails to file and register his notice of claim to paternity and his agreement to support the child *shall be barred from thereafter bringing or maintaining any action to establish his paternity of the child.* Such failure shall further constitute an abandonment of said child and a waiver and surrender of any right to notice of or to a hearing in any judicial proceeding for the adoption of said child, and *the consent of such father to the adoption of such child shall not be required.*

(Emphasis added.)

On appeal from the district court's decision not to apply the foregoing statute in this case, the parties have joined issue on the constitutionality of § 78–30–4(3), on its face and as applied to the circumstances of this case.

In *Ellis v. Social Services Department,* Utah, 615 P.2d 1250 (1980), we sustained § 78–30–4(3) against a claim that it violated the Equal Protection Clause.  Implicit in that decision was the holding that there are reasonable bases for the classifications in the statute (between unwed mothers and fathers and between fathers who file and fathers who do not) and that these classifications are reasonably calculated to serve a proper government objective.

The claim that this statute was facially invalid under the Due Process Clause of the federal or state constitutions was not resolved in *Ellis,* because the Court found that in any event the statute violated due process as applied to terminate the father's parental rights on the facts of that case.  In this case, where we sustain the statute in its termination of the father's rights, we must face both possibilities of unconstitutionality under due process: invalid on its face and invalid as applied.

## IV.  DUE PROCESS

### A.  In General

Most due process cases concern *procedural* requirements, notably notice and opportunity to be heard, which must be observed in order to have a valid proceeding affecting life, liberty, or property.  *E.g., Nelson v. Jacobsen,* Utah, 669 P.2d 1207 (1983); *State v. Casarez,* Utah, 656 P.2d 1005 (1982); *Concerned Parents of Stepchildren v. Mitchell,* Utah, 645 P.2d 629, 636 (1982); *Lindon City v. Engineers Construction Co.,* Utah, 636 P.2d 1070 (1981).  The general test for the validity of such rules, the test of *procedural* due process, is fairness.

*Substantive* due process concerns the content of the rules specifying when a right can be lost or impaired.  This question can arise in the context of a hearing where the procedural formalities were observed.  Thus, in *In re J.P., supra,* the statute was unconstitutional on its face because it provided that a judge could deprive parents of their parental rights "without a showing of unfitness, abandonment, or substantial neglect...."  648 P.2d at 1375.  That holding assumed that the

judge's hearing met all the requirements of procedural due process, but concluded that the statute was invalid in its substantive content.

■ A due process question can also arise when a statute provides that a particular right is automatically lost or impaired in a specific circumstance (without any notice or hearing, except insofar as may be involved in an after-the-fact declaration that the circumstances have occurred and the right has been lost or impaired).[2] Section 78–30–4(3), challenged in this case, is such a statute. Whether a due process challenge to this common type of legislation is procedural because the statute omits notice and hearing or substantive because it specifies a particular substantive rule is comparatively unimportant.

The almost universal opinion that substantive due process was abused in invalidating economic regulations in the first third of this century has culminated in a rational basis test so tolerant that the substantive content of economic statutes rarely violates due process. *See generally* McCloskey, *Economic Due Process and the Supreme Court: An Exhumation and Reburial,* 1962 Sup.Ct.Rev. 34, 39; R. Lee, *A Lawyer Looks at the Constitution,* 164–67 (1981). Our own decisions illustrate this conclusion. *E.g., Committee of Consumer Services v. Public Service Commission,* Utah, 638 P.2d 533, 536 (1981); *Banberry Development Corp. v. South Jordan City,* Utah, 631 P.2d 899 (1981); *Redwood Gym v. Salt Lake County Commission,* Utah, 624 P.2d 1138, 1142–43 (1981); *Baker v. Matheson,* Utah, 607 P.2d 233, 244 (1979); *Magleby v. State Department of Business Regulations,* Utah, 564 P.2d 1109, 1110 (1977). The presumption of constitutionality applied in these cases is further assurance that economic regulations will rarely be upset as violative of substantive due process.

■ In contrast to the test used to determine the validity of the economic regulations involved in the foregoing cases, a termination of parental rights must be tested against a more stringent standard, as discussed below. *See generally Developments in the Law—the Constitution and the Family,* 93 Harv.L.Rev. 1157, 1167 (1980).

### B. United States Constitution

In *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the Supreme Court held that a statute terminating parental rights of all unwed fathers without a hearing violated due process. Statutes like § 78–30–4(3) are responses to that decision, attempting to specify procedures by which the parental rights of unwed fathers can be terminated and the rights of adoptive parents can be assured in a manner consistent with due process.

In *Lehr v. Robertson,* — U.S. —, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), the United States Supreme Court had its most recent opportunity to review such a statute. Under New York law, as the trial court had held, the rights of natural parents are terminated by a final decree of adoption. *In re Adoption of Martz,* 102 Misc.2d 102, 423 N.Y.S.2d 378 (1979), *aff'd sub nom. Lehr v. Robertson, supra.* On appeal, the unwed father attacked a decree granting adoption of his two-year-old daughter. The father argued that he had received no notice of the adoption proceeding. The statute provided for notice to an unwed father, but only if he had filed a notice of intent to claim paternity with the putative father registry of the Department of Social Services, which this appellant had not done. Rejecting appellant's claim that the statute was a procedurally inadequate means to terminate parental rights of this character, the Supreme Court held the statute constitutional.

---

**2.** For example, in *Freeman v. Centerville City,* Utah, 600 P.2d 1003 (1979), we rejected a property owner's contention that our annexation statutes violated the due process clause in Art. I, § 7 of the Utah Constitution because they did not require that affected property owners be given notice of the proceedings and an opportunity to elect whether their property should be made subject to taxation and other burdens in the annexing city.

The New York legislature concluded that a more open-ended notice requirement would merely complicate the adoption process, threaten the privacy interests of unwed mothers, create the risk of unnecessary controversy, and impair the desired finality of adoption decrees. Regardless of whether we would have done likewise if we were legislators instead of judges, *we surely cannot characterize the state's conclusion as arbitrary.*

*Id.* 103 S.Ct. at 2995 (emphasis added).

■ Measuring § 78–30–4(3) against the precedent and standard established in *Lehr v. Robertson,* we hold that the procedure it specifies for terminating the parental rights of an unwed father is not "arbitrary" and is therefore constitutional under the Due Process Clause of the United States Constitution.

### C. Utah Constitution

We likewise hold that § 78–30–4(3) is consistent with the due process requirements of Art. I, § 7 of the Utah Constitution.

■ In this instance we apply a more stringent standard of review than "arbitrariness" or the rational basis test applicable to economic regulation challenged as violative of due process. *In re J.P., supra,* identified parental rights as "fundamental" for purposes of due process. 648 P.2d at 1372–74. In the context of alleged vagueness in statutory language, we have held that "[w]hen state action impinges on fundamental rights, due process requires standards which clearly define the scope of permissible conduct so as to avoid unwarranted intrusion on those rights." *In re Boyer,* Utah, 636 P.2d 1085, 1087–88 (1981). Similarly, "to avoid unwarranted intrusion" on the fundamental rights of parenthood we hold that Utah's Due Process Clause requires a higher level of scrutiny than is exercised to determine the validity of economic regulation. By analogy to the tests employed in judging the validity of alleged infringements on other fundamental rights, we hold that the proponent of legislation infringing parental rights must show (1) a compelling state interest in the result to be achieved and (2) that the means adopted are "narrowly tailored to achieve the basic statutory purpose." *Id.* at 1090.

*In re J.P., supra,* established a general rule against the termination of parental rights, except for designated causes. We explained the basis for exceptions to this fundamental right as follows:

The principle that "the welfare of the child is the paramount consideration" means that parental rights, though inherent and retained, are not absolute; that the state, as *parens patriae,* has the authority and obligation to assume a parental role after the natural parent has been shown to be unfit or dysfunctional; and that parental prerogatives cannot, at that extreme point, frustrate the state in discharging its duty.

648 P.2d at 1377.

■ The question in this case is whether the constitutional right we recognized in *In re J.P.* permits the exception inherent in § 78–30–4(3)'s provision that an unwed male parent will lose his parental rights in a newborn infant for failing to file a timely notice of his claim to paternity. We treat that question in light of our earlier holding that an unwed father's right to his relationship with his newborn is a provisional right by comparison with the vested right of a parent who has fulfilled a parental role over a considerable period of time. *In re J.P.,* 648 P.2d at 1374–75. We measure the statutory specifications for the termination of that provisional right against the tests of compelling state interest and narrowly tailored means.

For the reasons already reviewed in Part II, the state has a compelling interest in speedily identifying those persons who will assume a parental role over newborn illegitimate children. Speedy identification is important to immediate and continued physical care and it is essential to early and uninterrupted bonding between child and parents. If infants are to be spared the injury and pain of being torn from parents with whom they have begun the process of

bonding and if prospective parents are to rely on the process in making themselves available for adoptions, such determinations must also be final and irrevocable.

■ Section 78–30–4(3) is narrowly tailored to achieve the purposes identified above. No infringement of the unwed father's rights not essential to the statute's purposes has been identified. Due process does not require that the father of an illegitimate child be identified and personally notified before his parental right can be terminated. In the common cases of unwed fathers without desires to assume the responsibilities and to claim the rights of parenthood, such a requirement would frustrate the compelling state interest in the speedy determination described above. It would also threaten the privacy interests of unwed mothers and frustrate the other interests the United States Supreme Court cited in *Lehr v. Robertson, supra,* quoted in Part IVB.

■ In view of the compelling state interest in the summary determination prescribed in the statute and of the fact that the statutory terms are narrowly tailored to achieve the basic statutory purpose, we hold that § 78–30–4(3)'s provisions for terminating the parental right of the unwed father of a newborn infant are facially valid under the Due Process Clause in Art. I, § 7 of the Utah Constitution.

### D. Constitutionality as Applied

Finally, we inquire whether the statute was constitutionally applied in the circumstances of this case.

At the outset, it is clear that the exception defined in *Ellis v. Social Services Department, supra,* is inapplicable. In that case, the parents of the illegitimate child both lived in California. A few days before she was to give birth, the mother left California without the father's knowledge and came to Utah. In this state, she gave birth, declared the father to be unknown, and relinquished the child to an agency for adoption. Immediately upon learning of her whereabouts and within six days of the child's birth, the father notified the agency by phone that he intended to assert his parental rights. Within two weeks thereafter, he filed the statutory notice in Utah and filed suit to secure his rights. This Court held that the statute could not be applied to deprive this father of his parental rights without a hearing at which he would have "an opportunity to present evidence to show as a factual matter that he could not reasonably have expected his baby to be born in Utah." 615 P.2d at 1256. The Court explained the limits of its ruling as follows:

> In the usual case, the putative father would either know or reasonably should know approximately when and where his child was born. It is conceivable, however, that a situation may arise when it is *impossible* for the father to file the required notice of paternity prior to the statutory bar, *through no fault of his own.* In such a case, due process requires that he be permitted to show that he was *not afforded a reasonable opportunity* to comply with the statute.

*Id.* at 1256 (emphasis added).

■ In sharp contrast to *Ellis,* this case does not involve circumstances where through no fault of his own it was "impossible" for the father to file the required notice. Here the birth occurred in the same state as the father's residence, and neither the child's mother nor the agency was involved in any effort to prevent him from learning of the birth or from asserting his parental rights. Neither the mother nor the agency knew at the time the child was relinquished that the father was seeking to or intending to assert his parental rights. All the father needed to do to assert his rights was file his claim of paternity with the Utah Department anytime prior to September 24, the date the mother relinquished the child to the agency. He had sufficient opportunity to do so in this case, including ample advance notice of the expected time of birth and the fact that the mother intended to relinquish the child for adoption, advice of counsel on filing the required form, and a copy of the

form provided by a social worker for the department. These opportunities exceed what is necessary to contradict either one of the two essential elements of the *Ellis* exception: it was (1) "impossible" for the father to make a timely filing of the required notice (2) "through no fault of his own."

In apparent reliance on the *Ellis* statement that due process requires that the father be allowed to show "he was not afforded a reasonable opportunity to comply with the statute," the district court held that § 78–30–4(3) could not be applied to terminate the father's parental right in this case. Such an interpretation overlooks the fact that the "reasonable opportunity" referred to in the quoted sentence only applies "in such a case," i.e., when it is first shown that it was "impossible" for the father to file "through no fault of his own." Otherwise, the need to prove in each adoption case that the unwed father—whoever he may be—had a "reasonable opportunity" to file the required notice of paternity would frustrate the statute's purpose to facilitate secure adoptions by early clarification of status.

In *Lehr v. Robertson, supra,* the United States Supreme Court rejected a similar argument: that the unwed father should have received special notice of the adoption proceeding because, on the facts of that case, the trial court and the parties knew that he had filed a separate proceeding to establish his parental rights. The Supreme Court declared:

> This argument amounts to nothing more than an indirect attack on the notice provisions of the New York statute. The legitimate state interests in facilitating the adoption of young children and having the adoption proceeding completed expeditiously that underlie the entire statutory scheme also *justify a trial judge's determination to require all interested parties to adhere precisely to the procedural requirements of the statute....* Since the New York statutes adequately protected appellant's inchoate interest in establishing a relationship with Jessica, *we find no merit in the claim that his constitutional rights were offended because the family court strictly complied with the provisions of the statute.*

103 S.Ct. at 2995 (emphasis added). In applying that reasoning, the Court also noted that the right to receive notice of the adoption proceeding "was completely within appellant's control." *Id.*

We agree with the reasoning in *Lehr v. Robertson,* and we therefore hold that the agency correctly applied § 78–30–4(3) on the facts of this case and did not violate federal or state due process rights.

The judgment is reversed, and the case is remanded with directions to enter judgment for the defendants. Each party to bear own costs.

HALL, C.J., and STEWART, HOWE and DURHAM, JJ., concur.