**Tom SANCHEZ, Plaintiff and Appellant,**

v.

**L.D.S. SOCIAL SERVICES, Defendant and Respondent.**

**No. 17698.**

Supreme Court of Utah.

April 12, 1984.

Paul Gotay, Ogden, for plaintiff and appellant.

Allen M. Swan, Salt Lake City, for defendant and respondent.

STEWART, Justice:

The plaintiff, Tom Sanchez, appeals a dismissal of his petition for a writ of habeas corpus to obtain custody of the child he fathered who, born out of wedlock, is now over three years old. The mother had given the child up to defendant L.D.S. Social Services to be placed for adoption. The district court dismissed Sanchez's petition on the ground that he had abandoned the child pursuant to the terms of U.C.A., 1953,

§ 78–30–4(3). That provision reads as follows:

(a) A person who is the father or claims to be the father of an illegitimate child may claim rights pertaining to his paternity of the child by registering with the bureau of vital statistics of the division of health, Utah department of social services, a notice of his claim of paternity of an illegitimate child and of his willingness and intent to support the child to the best of his ability....

(b) The notice may be registered prior to the birth of the child but must be registered prior to the date the illegitimate child is relinquished or placed with an agency licensed to provide adoption services....

(c) Any father of such child who fails to file and register his notice of claim to paternity and his agreement to support the child shall be barred from thereafter bringing or maintaining any action to establish his paternity of the child. Such failure shall further constitute an abandonment of said child and a waiver and surrender of any right to notice of or to a hearing in any judicial proceeding for the adoption of said child, and the consent of such father to the adoption of such child shall not be required.

C.S.M., the child's natural mother, began dating Sanchez in the fall of 1979. From December, 1979, until March, 1980, she lived much of the time at Sanchez's apartment, during which time she became pregnant by him. On several occasions, before, during, and after the pregnancy, Sanchez proposed marriage, but she refused. Sanchez also expressed his desire to have her and the baby live with him after the birth. Prior to the child's birth, the mother told Sanchez that she might give the baby up for adoption. Both she and Sanchez discussed the problems presented by the expected child with a counselor at L.D.S. Social Services. The counselor did not inform Sanchez of the statutory right that he could assert by complying with the statutory filing requirement.

The baby was born on October 24, 1980. The mother signed papers relinquishing the child on the morning of October 27. Sanchez had earlier visited her and the baby in the hospital. At trial, he asserted that he assumed the three of them would eventually live together even though he and the mother had not discussed any plans to that effect and even though she told Sanchez that she would not live with him or marry him. C.S.M. called Sanchez on the morning of the 27th and told him to come to the hospital if he wanted to see the baby one last time. When Sanchez went to the hospital on the 27th, he did not protest the mother's decision to place the child for adoption. However, he did try to sign the birth certificate, but was not allowed to do so. He then attempted to register with the Bureau of Vital Statistics the afternoon of the 27th, but was not allowed to do so until the 28th. The baby had been relinquished by the mother to L.D.S. Social Services before Sanchez registered or attempted to register his status as natural father. L.D.S. Social Services placed the child in an adoptive home, and the child has now lived in that home over three years.

Sanchez contends that because § 78–30–4 does not provide for actual notice of the statutory procedure for establishing his parental rights, it denies him a liberty without due process of law. For reasons expressed in *Wells v. Children's Aid Society,* Utah, 681 P.2d 199, (1984), there is no constitutional requirement that § 78–30–4 give actual notice of the statutory requirements for establishing paternal rights.

The dissent concedes the facial constitutionality of § 78–30–4, but contends that the statute is unconstitutional as applied in this case. The concession of the facial

constitutionality of the statute and the assertion that the statute is unconstitutional as applied in this case are hard to reconcile. Sanchez lived in this state throughout the pregnancy, knew of the time and place of the birth of the child, and was presumed to know the law.[1] In *Wells* we expressly held that a father who tried to register in a timely fashion, but did not do so, was not entitled to notice.[2] *Wells* controls the issue here. It is of no constitutional importance that Sanchez came close to complying with the statute. Because of the nature of subject matter dealt with by the statute, a firm cutoff date is reasonable, if not essential.

The consequence of the position asserted by the dissent would be to promote litigation in a number of adoption cases, thereby holding the rights of putative adoptive parents, and the rights of the natural mother, whatever they may be, in limbo while the courts undertake to make a decision based on criteria nowhere articulated by the dissent, but which would, no doubt, involve the degree of the father's diligence and sincerity in trying to establish his parental rights, factors which are foreign to the statutory provisions. The damage done by the actual and potential disruption of the adoption system by protracted litigation of such cases would be especially incalculable as to the children involved. The harm caused to infants, who need stable relationships with adults for the psychological bonding necessary for their well-being and character development, could be incurable.

Marriage is the institution established by society for the procreation and rearing of children. Those who conceive children outside the bonds of marriage may be loving parents, but experience teaches that the number of illegitimate children born each year contribute disproportionately to many

---

**1.** On these facts, *Ellis v. Social Services Department of the Church of Jesus Christ of Latter-day Saints,* Utah, 615 P.2d 1250 (1980), is clearly distinguishable. In *Wells, supra,* we declined to expand the holding in *Ellis* beyond the type of factual situation involved in that case.

**2.** The dissent claims that the child's mother and L.D.S. Social Services deprived the father of the opportunity to claim his parental rights. That is

not accurate and is irrelevant. They simply did not inform him of the statutory procedure. Furthermore, C.S.M. probably did not know about the procedure. Whether L.D.S. Social Services had some duty to inform is not established by this record. But if it did and breached that duty, that does not constitute state action or result in a violation of due process.

of the serious social problems with which society must cope. It is not too harsh to require that those responsible for bringing children into the world outside the established institution of marriage should be required either to comply with those statutes that accord them the opportunity to assert their parental rights or to yield to the method established by society to raise children in a manner best suited to promote their welfare.

Affirmed. Costs to respondent.

HALL, C.J., and HOWE, J., concur.

DURHAM, Justice (dissenting):

I dissent from the holding of the majority opinion. The facts in this case are distinguishable from those in *Wells v. Children's Aid Society of Utah*, Utah, 681 P.2d 199 (1984). I believe that the factual differences warrant a different result and that the appellant is entitled to further hearing before his parental rights can be effectively terminated by application of the statutory presumption of abandonment.

As we discussed at length in *Wells, supra*, the requirements of U.C.A., 1953, § 78-30-4 are facially valid under the due process clauses of the federal and Utah Constitutions. However, nothing we said in *Wells* undermines the fundamental proposition, relied upon by this Court in *Ellis v. Social Services Department of the Church of Jesus Christ of Latter-day Saints, et al.*, Utah, 615 P.2d 1250 (1980), that the statute may be unconstitutionally applied. The test must be whether fundamental fairness has been preserved in the application of the statute to a given constellation of facts.

Unlike the unwed father in *Wells*, the appellant here, who had asserted his interest to the mother throughout the pregnancy and had repeatedly asked her to marry him, was not informed of her intent to release the child for adoption until after it was too late for him to meet the statutory filing deadline. Furthermore, the appellant had no knowledge of his statutory obligation, nor was he advised of its existence, unlike the father in *Wells*. He publicly acknowledged paternity throughout the pregnancy and personally informed the adoption agency of his opposition to adoption and desire for custody.[1] He attempted to sign the child's birth certificate *before* the child left the hospital (but was prevented from doing so by the natural mother's failure to consent), and he filed a notice of paternity within hours of learning of the statutory requirement (which he discovered upon consultation with an attorney) and within five days of the child's birth. No adoption petition had been filed, and the child was less than a week old when appellant commenced court proceedings. Unlike the paternal claimant in *Wells*, who had benefit of legal counsel and who knew of his statutory obligation well in advance of birth but nevertheless took no steps to secure his rights until it was too late, appellant here behaved throughout in a manner consistent with that of a concerned, committed father.

Utah's registration statute was designed to facilitate permanent and secure placements for newborn children whose unwed fathers take no steps to identify themselves promptly and acknowledge paternity. It was not created to encourage a "race" for placement to cut off the rights of fathers who are identified and present, but who are hours late in registering their claims because of ignorance of their statutory obligation. I believe that to apply the statutory bar against appellant in these circumstances contravenes all notions of fairness and due process under article I, § 7 of the Utah Constitution and under the federal Constitution. Everyone connected

---

1. The actions of L.D.S. Social Services, in concert with those of the mother, served to deprive appellant of his opportunity to claim his parental rights by complying with the statute. Although L.D.S. Social Services knew through its counselor that appellant opposed adoption and desired custody, it made no effort to advise him of the forthcoming release of the child for adoption or of the registration requirements of the statute. Nor, as we have noted, did the mother tell appellant of her intent to release the child in time for him to comply.

with these circumstances knew that this father wanted to assert his rights, and he in fact attempted to do so by every means known to him. This constellation of facts is entirely different from that in *Wells* and from the usual case of the nonpresent, unidentified, or indifferent unwed father, against whom the statutory bar was intended to operate in order to protect the needs of newborn infants and prospective adoptive parents.

The majority opinion mistakenly insists that the protection of appellant's rights advocated herein would "promote litigation in a number of adoption cases" and discusses at some length the damage and potential disruption that would result. I share the majority's commitment to permanency and stability in newborn placements. I believe it erroneously claims that a mechanical application of the statute, without regard for fundamental fairness, such as has occurred here, will prevent litigation and promote stability in the vast majority of adoptive settings. Under our statutory scheme, notice of adoption proceedings must be sent to all unwed fathers who have registered their interests. Those fathers are fully entitled to the right to consent to the adoption or to withhold consent, unless neglect, abuse or abandonment has been shown, just as are unwed mothers. It is interesting to note that under our system the first time anyone is obligated to check for a father's acknowledgment with the Bureau of Vital Statistics is "in the adoption proceeding," U.C.A., 1953, § 78–30–3(d), which cannot be heard by the trial court until the child has resided with the prospective adoptive parents for six months.

Thus, the potential for "disruption" is a part of the statutory scheme itself, and denying this appellant a hearing he would have been entitled to automatically if he had known of his obligation and filed 24 hours earlier does not promote any problems not already inherent in the statute. The majority appears to characterize Utah's statute in almost a punitive light, as being designed to cut off in stringent fashion the rights of *all* unwed fathers as quickly as possible because "illegitimate children born each year contribute disproportionately to many of the serious social problems with which society must cope." On the contrary, the statute appears to have been designed to cut off the rights of unknown, uncaring and uncommitted unwed fathers in order to protect the adoption process. In contrast, the rights afforded unwed fathers who comply with the statute appear to be coextensive with those of unwed mothers, thus belying any punitive intent by the Legislature. The unusual degree of disruption that this opinion's rationale might cause in this case would be a function of the trial court's failure, which I believe was erroneous, to treat this appellant as having substantially complied with the statute. This failure is the cause of the long delays necessary for resolution of these difficult legal issues, none of which are attributable to the appellant and none of which are likely to arise frequently in the routine operation of the statute and the adoption process. Our holding in *Wells* demonstrates that only in the rarest of circumstances are unwed fathers likely to be able to raise legitimate claims regarding the application of the statute. I believe such circumstances were shown in this case.

Appellant's rights as a natural parent should not have been foreclosed on these facts without a hearing on the question of the termination of those rights. Since the majority opinion does not permit such a hearing, I will not discuss the procedural context of the standards for termination that I believe would be applicable.

Having disqualified himself, Justice Oaks took no part in the final decision of this case.