740 P.2d 292 (1987)
In the Matter of K.B.E. and T.M.E., Minor Children.
No. 860289-CA.
Court of Appeals of Utah.
August 5, 1987.
David A. McPhie, Hintze, Brown, Faust, Blakesley & McPhie, Salt Lake City, for appellant.
S. Junior Baker, Snow & Halliday, Salt Lake City, for respondent.
Before GREENWOOD, DAVIDSON and JACKSON, JJ.

OPINION
GREENWOOD, Judge:
Appellants seek reversal of the district court's dismissal of their petition for adoption of T.M.E., a minor child.
*293 The natural mother of T.M.E. and her grandfather, appellants, filed a petition for adoption on August 26, 1985, the morning of T.M.E.'s birth.[1] The child's father, respondent herein, filed an acknowledgment of paternity with the Utah Bureau of Vital Statistics during the afternoon of August 26, 1985, after learning of the child's birth. T.M.E. did not leave the hospital where she was born until after August 26, 1985. Respondent filed a motion to intervene in the adoption proceedings. The motion was granted. Respondent then filed a motion to dismiss the adoption proceedings as to T.M.E. The district court granted respondent's motion, without holding an evidentiary hearing, finding that the acknowledgment of paternity was timely filed.
Appellants urge that respondent failed to timely file his acknowledgment of paternity pursuant to Utah Code Ann. § 78-30-4(3) (1986)[2], and therefore, the district court erred in finding, as a matter of law, that respondent had timely filed. The statute provides as follows:
(a) A person who is the father or claims to be the father of an illegitimate child may claim rights pertaining to his paternity of the child by registering with the registrar of vital statistics in the department of health, a notice of his claim of paternity of an illegitimate child and of his willingness and intent to support the child to the best of his ability... .
(b) The notice may be registered prior to the birth of the child but must be registered prior to the date the illegitimate child is relinquished or placed with an agency licensed to provide adoption services or prior to the filing of a petition by a person with whom the mother has placed the child for adoption. .. . (emphasis added).
(c) Any father of such child who fails to file and register his notice of claim to paternity and his agreement to support the child shall be barred from thereafter bringing or maintaining any action to establish his paternity of the child. Such failure shall further constitute an abandonment of said child and a waiver and surrender of any right to notice of or to a hearing in any judicial proceeding for the adoption of said child, and the consent of such father to the adoption of such child shall not be required.
.....
The district court's basis for finding a timely filing by the unwed father was that "the child actually had not been `placed' for adoption as required by the statute." Respondent propounds two alternative theories for finding lack of "placement" as required in the statute. First, respondent argues that physical "relinquishment" is required for completion of placement. Since the child was still in the hospital at the time of respondent's paternity filing, the filing was prior to placement. Alternatively, respondent argues that because this was a "stepfather" type adoption with the mother as a co-petitioner, the placement could not be completed until the child resided for one year with the mother and great grandfather, and therefore respondent complied with the statute.
Appellants argue to the contrary, that the statute is clear, that the unwed father must file prior to the filing of the adoption petition, and that "placement" is completed upon filing of the petition as all necessary arrangements have been made. Consequently, they contend the father's filing was not timely filed, as a matter of law. Respondent argues the district court, at best, should have held an evidentiary hearing to determine if respondent's failure to timely file was excusable to the extent that the statute should not have been applied, consistent with decisions of the Utah Supreme Court which are discussed below.
When asked to review the dismissal of an action with no evidentiary record before it, this Court will consider the allegations of the petition and other pleadings filed by the appealing party to be true, as well as any legitimate inferences which may be drawn *294 from those pleadings. Ellis v. Social Servs. Dep't, 615 P.2d 1250, 1252 (Utah 1980). An affidavit executed by the child's mother and certain other discovery responses were reviewed by the district court. The mother stated that she did not tell the respondent about the child's birth and did not want him present at the birth. She and her older child had resided with her grandfather for more than a year prior to the birth of T.M.E., and she intended to and did in fact, continue to live with him after the birth of T.M.E., along with both of her children. Prior to T.M.E.'s birth she directed her legal counsel to prepare a petition for adoption of both of her children by her grandfather. Shortly after the birth of T.M.E. she called her lawyer and told him of the birth and the name selected for the child. The name and date of birth were then inserted in the petition and it was filed with the court.
The Utah Supreme Court has held that the Utah Constitution, article I, §§ 7 and 25, guarantees parents a fundamental right to sustain relationships with their children. In re J.P., 648 P.2d 1364, 1377 (Utah 1982). In J.P. a statute was found unconstitutional which allowed involuntary permanent termination of parental rights if a finding were made that such termination was in the best interest of the child, with no requirement of parental unfitness. Justice Oaks, writing for the majority, examined the breadth of the constitutional protection.
[P]arents in different circumstances are apparently entitled to different degrees of protection for their parental rights. Parental rights are at their apex for parents who are married. Some variation exists among unwed fathers. While those who have fulfilled a parental role over a considerable period of time are entitled to a high degree of protection (citation omitted) unwed fathers whose relationship to their children are merely biological or very attenuated may, in some circumstances, be deprived of their parental status merely on the basis of a finding of the "best interest" of the child (citation omitted)....
Id. at 1374-75.
The United States Constitution has been similarly construed to protect parental rights under the fifth and fourteenth amendments, with a lesser intensity for unwed or non-present parents under some circumstances. Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983).
The Utah Supreme Court examined Utah Code Ann. § 78-30-4(3)(b), in four fairly recent decisions. In re Adoption of Baby Boy Doe, 717 P.2d 686 (Utah 1986); Wells v. Children's Aid Soc'y, 681 P.2d 199 (Utah 1984); Sanchez v. LDS Social Servs., 680 P.2d 753 (Utah 1984); Ellis v. Social Servs. Dep't, 615 P.2d 1250 (Utah 1980). In each of these cases the unwed father undisputedly filed the acknowledgment of paternity after the child had been either relinquished to an agency for adoption or a petition to adopt had been filed. The Court consistently found the statute constitutional on its face. Baby Boy Doe, 717 P.2d at 689; Wells, 681 P.2d at 207; Sanchez, 680 P.2d at 755; Ellis, 615 P.2d at 1256. The Wells Court held that the state has a legitimate and compelling interest which justifies the statutory infringement upon an unwed father's parental rights. Wells, 681 P.2d at 207. In Wells Justice Oaks, writing for the unanimous Court, described this interest as follows:
The state has a strong interest in speedily identifying those persons who will assume the parental role over such children, not just to assure immediate and continued physical care but also to facilitate early and uninterrupted bonding of a child to its parents. The state must therefore have legal means to ascertain within a very short time of birth whether the biological parents (or either of them) are going to assert their constitutional rights and fulfill their corresponding responsibilities, or whether adoptive parents must be substituted.
Id. at 203.
It is therefore vitally important to know finally and immediately if a newborn illegitimate child may be adopted. Early resolution allows the bonding process between parent and child to commence and continue. *295 The statute seeks to balance the competing interests of the child and the putative father by first, identifying the person who acknowledges paternity and the resultant responsibilities, and second, if such identification does not occur, allowing for speedy adoption. Id.
After acknowledging the statute's facial validity, however, the Utah Supreme Court remanded two of the cases for evidentiary hearings, finding that the statute violated due process as applied. In Ellis both parents lived in California prior to the child's birth. The mother moved to Utah without the knowledge of the father and made arrangements for the child's adoption. The father attempted to find the mother but was unable to do so until after the child's birth. He filed an acknowledgment of paternity approximately 18 days after the child's birth and relinquishment by the mother to an agency. The Court remanded, finding that the father's failure to timely file was apparently through no fault of his own. "In such a case, due process requires that he be permitted to show that he was not afforded a reasonable opportunity to comply with the statute." (footnote omitted) Ellis, 615 P.2d at 1256.
Similarly, in Baby Boy Doe, Justice Durham, speaking for the majority though divided Court, found that although it was not absolutely impossible for the father to have filed an acknowledgment of paternity, the circumstances justified remand for an evidentiary hearing. Justice Durham noted that the father had lived out of state, the mother and her family knew he was opposed to adoption of the child, the baby was born early while the father was traveling looking for a home for himself and his intended wife and child, and information regarding the baby had been deliberately withheld or misrepresented by the mother and her family. Justice Durham further stated that the standards as set out in the four cases were "developed in recognition of the need to balance the competing interests in this type of case: the significant state interest in speedily placing infants for adoption and the constitutionally protected rights of putative fathers." Baby Boy Doe, 717 P.2d at 691. In both Ellis and Baby Boy Doe remand for evidentiary hearing was ordered despite the potential voiding of adoptions, moving the children to new parents, and disruption of the bonding process.
In the instant case, this Court could remand to the district court for an evidentiary hearing to determine if respondent meets the criteria set forth in Ellis and Baby Boy Doe and discussed in Wells and Sanchez. However, the facts in this case are significantly different from those existing in the earlier cases. In each of those cases the child's mother was voluntarily terminating her parental relationship to place the child with new parents. Here, appellant mother has not relinquished custody of the child. She petitioned for joint custody of the child for herself and her grandfather. The statute in question does not clearly address the situation we find here, as it contemplates either agency adoptions or private placement with new parents. Respondent urged in oral argument that we adopt the one year standard required in stepfather adoptions. However, we decline to do so, believing that is the legislature's prerogative. Neither can we discover a meaning for "placement" in this context which does not create more potential problems than it solves. As a result, we find the statutory language is sufficiently unambiguous and therefore, respondent failed to timely file in accordance with the statute.
The concurring opinion of Judge Jackson concludes to the contrary, that § 78-30-4(3) does not apply to situations where the mother of the child maintains custody of the child and where the only potential adoption proceeding concerns one who will be a co-parent with her, i.e., a stepfather or, in this case, the mother's grandfather. We believe that reasoning to be inconsistent with the language of the statute and fraught with potential pitfalls.
Section 78-30-4(3)(b) contains two alternative events before which a putative father must file the affidavit of paternity. Each event is preceeded by the phrase "prior to." Consequently, the father's filing *296 must be prior to either (1) relinquishment or placement with an agency; or (2) filing of a petition by a person with whom the mother has placed the child for adoption. Therefore, "relinquished" applies only to agency adoptions and not to private placements, which include "stepfather" adoptions. The concurring opinion suggests that the statute is inapplicable unless and until the mother decides "to give the child up for adoption." That phrase, taken from Wells, appears to us to be synonymous with "relinquishment" and is not required by nor consistent with the statute. Further, Wells and the three other related cases can be distinguished in that in those cases the mother did "give up" or "relinquish" her child entirely to others, whereas this case involves a "stepfather" adoption.
Furthermore, the statute does not contain exclusionary language to demonstrate a legislative intent to exempt stepfather adoptions from its coverage. This Court should not substitute its judgment for that of the legislature when it is not necessary to do so.
We also see practical problems which arise from application of the concurring opinion. That opinion states that "stepfather" adoptions should proceed "by use of consent or traditional abandonment procedures." Those procedures differ from § 78-30-4(3)(b) which states that failure to timely file eliminates the necessity of proving abandonment or obtaining consent of the father in adoption proceedings. It is certainly not unforeseeable that in many instances the mother of an illegitimate child will either not know the identity of the child's father or will have a legitimate reason for not disclosing his identity. In such instances, if the procedures of § 78-30-4(3) are not available, obtaining consent or proving abandonment will often be impossible and/or unwise.
The concurring opinion concludes that the state interest in providing for early adoptions of illegitimate children and commencement of the child-parent bonding process is not present when the mother retains custody. We find nothing in the cases analyzed which necessarily mandates such a conclusion, and might be persuaded that speedy commencement of bonding between a child and its stepfather is also essential.
Returning to facts here at issue, although we have found that respondent failed to timely file, we must also examine whether the statute was constitutionally applied to respondent. The state's interest, as represented in the statute, is to allow for early adoption of illegitimate children and commencement of the bonding process between the child and its new adoptive parents. Such interest must be balanced against the constitutionally protected right of the unwed father to maintain and develop a parental relationship. In Utah, the Supreme Court has declared that under the Utah Constitution the parental interest is a "fundamental" right to be invaded only to the extent necessary to promote a "compelling" state interest. J.P., 648 P.2d at 1372. In this instance the state interest would not be promoted by disallowing respondent's acknowledgment of paternity. In filing the adoption proceeding it was the mother's intention that she would maintain her custody and maternal relationship with T.M.E. and that she and her two children would live with her grandfather. The trial court's ruling did not alter that living arrangement. The significant differences resulting from the ruling in respondent's favor are that respondent will provide financial support for T.M.E. and that respondent will be able to develop a parental relationship with T.M.E. These differences have the potential of benefiting, not harming, respondent's child. To deprive both respondent and T.M.E. of the possible benefits of their relationship simply because respondent filed his notice just a few hours after appellants filed their petition for adoption  which petition had been prepared much earlier, possibly with the intent of thwarting respondent  flies in the face of fundamental fairness and due process. As stated by Justice Durham in her dissent in Sanchez, the statute was "not created to encourage a `race' for placement to cut off the rights of fathers who are identified and present... ." Sanchez, 680 P.2d at 756. This is particularly true where the father is willing to assume the responsibilities of *297 parenthood and the mother is not relinquishing custody of the child. As stated in Lehr v. Robertson, 463 U.S. 248, 262, 103 S.Ct. 2985, 2993, 77 L.Ed.2d 614 (1983), "[w]hen an unwed father demonstrates a full commitment to the responsibilities of parenthood by `com[ing] forward to participate in the rearing of his child,' (citation omitted) his interest in personal contact with his child acquires substantial protection under the Due Process Clause." We agree with the trial court's statement in its minute entry, that "the time lapse between filing the petition for adoption and filing the acknowledgment of paternity was so short that it demands the intervention of the equitable power of the court." Application of the statute to invalidate respondent's acknowledgment of paternity would impermissibly violate respondent's constitutional rights under both the Utah and the United States Constitutions. While it may have bolstered respondent's position to have held an evidentiary hearing, the uncontroverted facts are sufficient to sustain respondent's position as a matter of law.
The judgment of the trial court is affirmed.
DAVIDSON, J., concurs.
JACKSON, Judge (concurring in result).
The lower court held that Ronald U.'s acknowledgment of paternity was timely filed, reasoning that (1) "the child actually had not been `placed' for adoption as required by the statute" and (2) the time lapse between the respective filings "was so short that it demands the intervention of the equitable powers of the court." My colleagues conclude that he failed to timely file in accordance with the statute, but then rescue him with a due process rationale. I would take a more direct route to the same result by holding that the statute's filing requirement does not apply in this case.
T.M.E., the illegitimate child of Saundra E. and Ronald U., was born August 26, 1985. Two hours later, Saundra and her grandfather, Hugo E., filed in Third District Court a joint petition for leave to adopt T.M.E. and another child of Saundra's. Paragraph 7 of the petition alleged: "Further that the co-petitioner, Saundra E., is the natural mother of the children and is a fit and proper person to have their care, custody and control." A similar allegation was made regarding Hugo. Paragraph 8 alleged that he was ready, willing, and able "to have their care, custody, supervision and training charged to him, along with the co-petitioner, his granddaughter, Saundra E." The prayer of the petition requested the court to "at a later date, when the minor child T.M.E. has been with the petitioners for a year, reopen the matter and make a determination with regard to this petition concerning the minor child T.M.E." The petitioners also asked that this child be known by the surname of the mother, not of the grandfather. They requested a birth certificate showing T.M.E. to be in every way the legal child of petitioners. In the adoption proceedings, Ronald U. formally intervened and requested Saundra to "admit that on August 26, 1985, it was your intent to place the baby girl or give the baby girl up for adoption" (emphasis added). That request for admission was denied. Ronald then served Interrogatories requesting a more detailed response. Answer: "... it was never the defendants [sic] intention to place the baby girl for an adoption in which she would have relinquished her rights as the natural mother" (emphasis added). The record verifies that, after adoption, T.M.E. would continue to reside with her mother and that Saundra had no intention of terminating the mother-daughter relationship.
The Utah Supreme Court has considered present Utah Code Ann. § 78-30-4 (1986) four times.[1]In re Adoption of Baby Boy Doe, 717 P.2d 686 (Utah 1986); Wells v. Children's Aid Soc'y, 681 P.2d 199 (Utah 1984); Sanchez v. LDS Social Servs., 680 P.2d 753 (Utah 1984); Ellis v. Social Servs. Dep't, 615 P.2d 1250 (Utah 1980). In Ellis, the mother gave up physical custody and waived all parental rights in favor of an agency. In Wells, the mother had released *298 the child to an agency, and the agency had then placed the child with adoptive parents. In Sanchez, the mother had given the child up to an agency. In Baby Boy Doe, the mother had waived her rights and adoptive parents had been given temporary custody. In the case before us, however, T.M.E.'s mother still has her. None of the four prior Utah cases considered whether or how Utah Code Ann. § 78-30-4(3) applies to the circumstances of T.M.E. or her parents.[2]
The first question to ask is whether T.M.E. has become the "such child" contemplated in subsection (3)(c). To qualify as a "such child", two conditions must be met. First, subsection (3)(a) says the child must be illegitimate. Second, pursuant to (3)(b), the child must be given up for adoption by the mother either to a licensed agency or to a third person. T.M.E. is illegitimate, but her mother did not give her up to an agency or another person. I would, therefore, hold that subsection (3) does not apply to T.M.E.'s father. He does not need to file a notice of his claim to T.M.E. because the mother has not met the second statutory requirement of relinquishing or placing the child.
Saundra planned and intended to continue exercising all of her parental rights to T.M.E., including care, custody and control. Utah Code Ann. §§ 78-30-4(1), (2), and (3) (1986) each contemplate a surrender of one's parental rights and interests and a release of physical custody and control. The statute requires this giving up whether the child goes to a licensed agency or to a third person. The mother of an illegitimate child would normally be the one who elects whether to give up the child. If she has no intention of doing so and, in fact, elects to retain all rights and interests along with care, custody and control, subsection (3) does not apply. Until she cuts herself off from the child, there is no need for the state to intervene on behalf of the child and cut off the rights of the natural father. Consequently, until the mother gives up the child, the statute does not require the putative father to register a notice of his claim of paternity. Otherwise, as here, the unwed mother by subterfuge and/or collusion can initiate a sham adoption proceeding solely to terminate the rights of a natural father who is willing to acknowledge and support his child.
In applying Utah Code Ann. § 78-30-4(3) (1986) to other fact situations involving unwed parents, the Utah Supreme Court has recognized that the statute requires a putative father to act to protect his parental rights if the mother gives up her rights to the child. In Ellis, for example, the Court declared that the 1975 enactment of subsection (3) "effectively limited the time in which the putative father may assert those rights where the mother has relinquished her rights to the child." Ellis v. Social Servs. Dep't., 615 P.2d at 1253 (emphasis added). The Court went on to conclude that "whenever the natural mother relinquishes custody of the child either to an agency or to an individual for purposes of adoption ... the putative father must file a notice of paternity ..." and that subsection (3)(c) bars the natural father from "`maintaining any action to establish his paternity of the child' after the child is *299 given up for adoption." Id. at 1254-55 (emphasis added).
This interpretation of the statute is consistent with the state's identified interest in providing for the prompt and final determination of who will provide parental care and support for illegitimate newborns if neither natural parent is willing to do so:
There are special problems in defining parental rights over newborns who are illegitimate. The identity of the father may be unknown. The mother may desire to give the child up for adoption. The state has a strong interest in speedily identifying those persons who will assume the parental role over such children, not just to assure immediate and continued physical care but also to facilitate early and uninterrupted bonding of a child to its parents. The state must therefore have legal means to ascertain within a very short time of birth whether the biological parents (or either of them) are going to assert their constitutional rights and fulfill their corresponding responsibilities, or whether adoptive parents must be substituted.

Wells v. Children's Aid Soc'y, 681 P.2d at 203 (emphasis added).
The state's interests are not triggered until the mother decides "to give the child up for adoption." Until she does so, there is no need to "speedily identify those persons who will assume the parental role over such children." She is still fulfilling that role. While she has the child, the state need not be concerned about "immediate and continued physical care" and there is no need for the state to "facilitate early and uninterrupted bonding of a child to its [new adoptive] parents."
In stepfather-like relationships, the mother keeps the child. Speedy termination of the natural father's interests is not necessary. Our legislature has recognized that a slow and cautious approach should be used when the mother remains in control of the child. Subsection 78-30-4(3) was inserted into our statute in 1975. Prior to 1975, the last sentence of section 78-30-14(4) provided:
No petition for adoption shall be granted until the child shall have lived for one year in the home of the adopting parents.
Recognizing the need to speed up the process where the mother has surrendered the child for adoption and also the need to slow down the process when the mother retains the child and enters a relationship with a stepparent, the 1975 legislature rewrote this provision:
No petition for adoption shall be granted until the child shall have lived for six months in the home of the adopting parents except that when the adopting parent is the spouse of one of the natural parents, no petition for adoption shall be granted until the child shall have lived for one year in the home of the adopting parent.
Utah Code Ann. § 78-30-14(4) (1975) (emphasis added). The distinction is retained in the current statute. Utah Code Ann. § 78-30-14(7) (1986). Prior to 1977, Utah Code Ann. § 78-30-5 provided that a parent's consent was not required for adoption where the parent failed to support or communicate with the child for a period of one year. In 1977, the legislature amended this section and made the one-year failure a rebuttable presumption. Utah Code Ann. § 78-30-5 (1977).
The relationship of both one-year provisions is meaningful. The natural father has one year to come forward and show his interest in the child. If he does not, abandonment is presumed. Likewise, the statute implies that when the natural mother has control of the child, one year is a reasonable time to determine whether the child has bonded to a stepfather. If these provisions have any meaning or purpose related to T.M.E. and her father, that meaning and purpose should not be thwarted by misapplication of Utah Code Ann. § 78-30-4(3) to prematurely cut off his parental rights.
In the case before us, there is no need to make a "final and immediate determination" that T.M.E. can be adopted by some third person or persons. The child is fine where she is, in the arms of her mother who has elected to keep her. Accordingly, *300 there is no significant justification for the state to intervene and speedily terminate the unwed father's constitutionally protected parental rights. Since Utah Code Ann. § 78-30-4(3)(c) does not apply in this situation, we need not reach the due process question nor invoke the equitable powers of the court.
My colleagues are concerned that this result leaves no way to extinguish the putative father's parental rights in stepfather adoptions. I believe their rationale is contrary to the underlying legislative policies and the plain reading of the statute. I see nothing wrong with treating the natural father's rights and interests, in the stepchild adoption context, the same way those rights and interests have been treated historically. That is, by use of consent or traditional abandonment procedures. Application of the statute to the facts before us, requiring the filing of a paternity notice even though the mother has kept the child, might not pass constitutional muster. There could be abuse of the system by an unwed mother who, as here, would race to the courthouse with a petition for adoption signed by any petitioner available, solely to terminate the parental rights of a man she wants out of her life and her child's life.
NOTES
[1] Appellants also petitioned for the adoption of an older child, K.B.E. The petition was granted as to K.B.E. and is not at issue.
[2] Section 78-30-4(3) was amended in 1986 but the changes do not affect the issue in this case.
[1] In 1975, Utah Code Ann. § 78-30-4 was adopted with its current provisions. Some minor changes in wording occurred by repeal and re-enactment in 1981.
[2] The United States Supreme Court has, in four differing fact situations, examined the extent to which the due process clause protects a biological father's relationship with his child. Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (state law conclusively presuming unwed father to be unfit child custodian denies him procedural due process); Quilloin v. Walcott, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978) (application of Georgia law requiring unwed father to obtain court order legitimizing child in order to acquire statutory right to veto adoption does not violate due process where natural father did not seek legitimization until stepfather filed petition to adopt 11-year-old son); Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979) (New York law authorizing unwed mother to veto adoption of child by withholding consent, but denying same power to similarly situated unwed father, violates equal protection clause); Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (unwed father was not denied procedural due process by lack of notice of, and opportunity to be heard in, adoption proceedings by 2-year-old child's stepfather where natural father took none of the numerous statutory steps available to assure his entitlement to such notice).