**In the Matter of the ADOPTION OF W, Baby Boy.**

No. 940702–CA.

Court of Appeals of Utah.

Oct. 12, 1995.

---

Dean C. Andreasen and Clark W. Sessions, Salt Lake City, for Appellant.

Les F. England, Salt Lake City, for Appellee.

Before DAVIS, BILLINGS, and WILKINS, JJ.

## OPINION

WILKINS, Judge:

Nakiatova Royal challenges the trial court's ruling which terminated his claim to parental rights to Baby Boy W and granted the adoptive parents' petition to adopt Baby Boy W. We affirm.

## BACKGROUND

On January 11, 1994, Baby Boy W was born in Las Vegas, Nevada, to an unmarried woman from Indiana, and was immediately placed in the control of an adoption agency. Mr. Royal, who claims to be the child's biological father, is also from Indiana. On January 12, 1994, Mr. Royal commenced an action to establish his paternity of Baby Boy W in Indiana. Later that same day, a petition to adopt Baby Boy W was filed by the adoptive parents in Utah.

On January 19, 1994, the biological mother consented to the adoption of Baby Boy W, and the adoptive parents took custody of Baby Boy W. Since then, Baby Boy W has been in the exclusive care, custody, and control of the adoptive parents.

Baby Boy W's biological mother stated in an affidavit filed with the adoption petition that she became pregnant after she was raped and that she did not know the identity of the child's father. Later, the biological mother recanted, stating that she was not raped, that she knew the identity and location of the child's father, and that the child's father, who she also claims is Mr. Royal, was aware of her pregnancy.

In his brief, Mr. Royal claims that he did not know that the biological mother had gone to Nevada to give birth to Baby Boy W. He alleges that he and the biological mother had made plans to marry and to raise the child together, claiming that he had even turned down athletic scholarships so he could "get a job and support [his] family." He further claims that the biological mother, who was a minor living at home, was beaten by her father because of her relationship with Mr. Royal, and that when she told her parents of her pregnancy in October 1993, they took her first to a maternity home in Indiana, then to Las Vegas in December 1993. Mr. Royal testified that he tried to locate the mother in December, but that her family refused to tell him where she was.

The biological mother finally told Mr. Royal of Baby Boy W's birth and the pending Utah adoption during a phone conversation in late January 1994. However, Mr. Royal did not contact the adoptive parents until March 7, 1994, when he called their attorney. On March 8, 1994, Mr. Royal's attorney in Indiana called the adoptive parents' attorney to say that Mr. Royal intended to file an objection to Baby Boy W's adoption.

Mr. Royal took no further action until early May 1994, when the adoptive parents' attorney received a telephone call from Mr. Royal's attorney in Utah, who repeated that Mr. Royal intended to file an objection to Baby Boy W's adoption proceedings. This objection was eventually filed on May 25, 1994. However, at no time during the four months after he learned of the birth and the Utah adoption proceedings did Mr. Royal file the necessary paternity notice with the Utah State Department of Vital Statistics. In fact, the required paternity notice had not been filed as late as eight months after Mr. Royal's notification of Baby Boy W's birth and placement for adoption.

An evidentiary hearing was held on August 24, 1994, where Mr. Royal appeared and stated his objections to the adoption. The trial court entered its final order terminating any claim Mr. Royal may have had to Baby Boy W on October 13, 1994, and on October 21, 1994 the trial court granted the final decree of adoption of Baby Boy W to the adoptive parents.

## ISSUES RAISED ON APPEAL

On appeal, Mr. Royal argues that: (1) section 78–30–4.1 of the Utah Code requires his consent for the adoption of Baby Boy W to be valid; (2) the provisions of section 78–30–4.8 of the Utah Code do not preclude him from filing an objection to the petition for adoption; (3) he substantially complied with the requirements of section 78–30–4.8; (4) the facts fall within an exception to the requirements of section 78–30–4.8; (5) the adoption proceedings violated his due process rights; (6) as a matter of comity, the trial court should have deferred proceeding with the adoption until after the Indiana court ruled on appellant's paternity action; (7) the biological mother's relinquishment of her parental rights and consent to adoption should be ·set aside because of duress and undue influence; and (8) the trial court lacked jurisdiction under the Uniform Child Custody Jurisdiction Act.

## STANDARD OF REVIEW

■ Each of the issues raised by Mr. Royal is a question of law as presented here. We are not obligated to give deference to the trial court's conclusions of law but review them for correctness. *Western Kane County Special Serv. Dist. No. 1 v. Jackson Cattle Co.*, 744 P.2d 1376, 1377–78 (Utah 1987).

## ANALYSIS

The issues raised by Mr. Royal question the proper application of provisions of the Utah adoption statutes, and especially sec-

tion 78–30–4.8 as it relates to the right of a putative father to participate in adoption proceedings. Mr. Royal challenges the legal conclusions reached by the trial court regarding these issues, which conclusions we affirm. To understand the basis of these legal conclusions, and our decision to affirm, it is important to understand the development of the statutes in question.

## I. History of the Utah Adoption Statutes

Utah's first adoption law was passed in 1898. *See* Utah Rev.Stat.Title I (1898). It did not require a natural father's consent to the adoption of his illegitimate child, although it required that both parents consent to the adoption of their legitimate child. *See id.* § 4 ("A legitimate child cannot be adopted without the consent of its parents, if living, nor an illegitimate child without the consent of its mother, if living. . . ."). However, the 1898 law also allowed the father of an illegitimate child to automatically adopt the child, thereby making the child legitimate, if he publicly acknowledged his paternity and treated the child as his legitimate child.[1] By acknowledging his paternity in this way, the father obtained legal rights in relation to the child. *Id.* § 10.

The Utah Supreme Court upheld the constitutionality of this statutory approach as recently as 1961. *See Thomas v. Children's Aid Soc'y of Ogden*, 12 Utah 2d 235, 239, 364 P.2d 1029, 1031–32 (1961) (holding father of illegitimate child does not have rights to child within scope of Utah and Federal Constitutions). The United States Supreme Court later held in *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), that unwed fathers enjoy an "opportunity interest" to establish a relationship with their children under the Due Process Clause of the United States Constitution. *Id.* at 262, 103 S.Ct. at 2993–94. Since the *Thomas* case, Utah courts have also held that unwed fathers enjoy a due process right under the Utah Constitution in connection with their

---

1. The statute provided:

    The father of an illegitimate child by publicly acknowledging it as his own, receiving it as such with the consent of his wife, if he is married, into his family, and otherwise treat-

    ing it as if it were a legitimate child, thereby adopts it as such, and such child is thereupon deemed for all purposes legitimate from the time of its birth.

    Utah Rev.Stat.Title I, § 10 (1898).

children. *See, e.g., In re J.P.*, 648 P.2d 1364, 1372–75 (Utah 1982) (holding that parents in different circumstances enjoy different degrees of constitutional protection).

Utah's adoption laws maintained this distinction between legitimate and illegitimate children, and the difference in the rights enjoyed by the natural parents of an illegitimate child, until 1965.[2] In 1965, the legislature deleted the statutory reference to the distinction between both parents having rights in their legitimate children but only the mother having rights in her illegitimate children. Instead, the amended statute provided that "[a] child cannot be adopted without the consent of each living parent having rights in relation to said child." Law effective March 20, 1966, ch. 20, § 1, 1966 (1st Spec.Sess.) Utah Laws 20, 21 (codified at Utah Code Ann. § 78–30–4 (Supp.1967)). This change was proposed by Representative Buckner because the terms "legitimate" and "illegitimate" were considered "archaic" and "stigmatizing to children." Recording of Utah House Floor Debates, 36th Legislature (1st Spec.Sess.), (January 14, 1966).

In 1975, the requirement that a purported father register his notice of paternity to secure any rights in relation to a child being placed for adoption was added to the statute.

*See* Law of February 21, 1975, ch. 94, § 1, 1975 Utah Laws 378, 379–80.[3] This requirement was intended to speed up the adoption process of children whose natural fathers could not be identified or located. Recording of Utah House Floor Debates, 41st Legislature, January 22, 1975. As Representative Matheson explained, the language "each living parent having rights in relation to said child" had been interpreted by Utah judges, based on Utah and United States Supreme Court opinions, to mean that natural fathers had rights in their illegitimate children. *Id.* As a result, adoption agencies in Utah were not quickly placing children with adoptive families when they did not know who or where the natural father was. *Id.* Sometimes these agencies even thought it necessary to have a court declare the children "abandoned" before they could place the children for adoption. Recording of Utah Senate Floor Debates, 41st Legislature, February 6, 1975. The registration requirement was viewed as a procedure that would protect the putative father's parental rights if he timely claimed his paternity, while also allowing an adoption to safely proceed if the putative father failed to make a timely claim to his rights. *Id.*

**2.** *See* Utah Code Ann. § 78–30–4 (Supp.1965); Law of March 12, 1963, ch. 192, § 1, 1963 Utah Laws 631, 631–32; Utah Code Ann. § 14–4–4 (1943); Law of March 13, 1941, ch. 16, § 1, 1941 Utah Laws 24, 24; Utah Rev.Stat. § 14–4–4 (1933); Law of March 11, 1925, ch. 91, § 1, 1925 Utah Laws 198, 198–99; Utah Comp.Laws Title II, § 4 (1917); Utah Comp.Laws Title II, § 4 (1907).

**3.** The subsection added to section 78–30–4 provided:

(3)(a) A person who is the father or claims to be the father of an illegitimate child may claim rights pertaining to his paternity of the child by registering with the bureau of vital statistics of the division of health, Utah department of social services, a notice of his claim of paternity of an illegitimate child and of his willingness and intent to support the child to the best of his ability. . . .

(b) The notice may be registered prior to the birth of the child but must be registered prior to the date the illegitimate child is relinquished or placed with an agency licensed to provide adoption services or prior to the filing of a petition by a person with whom the mother has placed the child for adoption. . . .

(c) Any father of such child who fails to file and register his notice of claim to paternity and his agreement to support the child shall be barred from thereafter bringing or maintaining any action to establish his paternity of the child. Such failure shall further constitute an abandonment of said child and a waiver and surrender of any right to notice of or to a hearing in any judicial proceeding for the adoption of said child, and the consent of such father to the adoption of such child shall not be required.

(d) In any adoption proceeding pertaining to an illegitimate child, if there is no showing that the father has consented to the proposed adoption, it shall be necessary to file with the court prior to the granting of a decree allowing the adoption a certificate . . . [which states] that a diligent search has been made of the registry of notices from fathers of illegitimate children and that no registration has been found pertaining to the father of the illegitimate child in question.

Utah Code Ann. § 78–30–4(3)(a)–(d) (Supp. 1975).

In 1983, the United States Supreme Court declared that an unmarried father enjoys an opportunity interest to develop a relationship with his biological children as a liberty interest under the Due Process Clause of the United States Constitution. *Lehr*, 463 U.S. at 262, 103 S.Ct. at 2993–94, 77 L.Ed.2d 614. In 1987, the Utah Court of Appeals concluded that unmarried fathers also enjoy a liberty interest in their biological children under the Utah Constitution. *See In re K.B.E.*, 740 P.2d 292, 294 (Utah App.1987).

In 1990, Utah House Bill 56 repealed the former section 78–30–4 registration requirement and replaced it with sections 78–30–1.5 and 78–30–4.1 to –4.10, which apply to Mr. Royal as amended in 1994. *See* Law of February 2, 1990, ch. 245, §§ 1–24, 1990 Utah Laws 1173, 1173–78. House Bill 56 was the result of a year-long study made by the Legislative Adoption Recodification Task Force. Tape of Utah House Floor Debates, 48th Legislature, January 15, 1990. As Representative Rush, the bill's sponsor, explained, the bill was designed "to protect the best interests of the child who enters this life under adverse circumstances." *Id.*

One of the purposes of the 1990 amendments was to resolve differences between United States Supreme Court and Utah Supreme Court decisions and Utah's adoption statute, especially those regarding the rights of putative fathers. Tape of Utah House Floor Debates, 48th Legislature, January 15, 1990. Of particular importance was the court-created "impossibility" exception to the paternity notice requirements of the old section 78–30–4.

In 1980, in *Ellis v. Social Services Department of the Church of Jesus Christ of Latter–Day Saints*, 615 P.2d 1250, 1255–56 (Utah 1980), the Utah Supreme Court announced an "impossibility" exception to section 78–30–4, holding that a putative father's

due process rights were violated if his parental rights were terminated for failure to register a notice of paternity when it was impossible for him to have filed his notice within the statutory time frame. In *Ellis*, the father of an illegitimate child, who did not file and register his notice of paternity before the child was placed with an adoption agency or before an adoption petition was filed, had been barred from establishing his paternity and had been statutorily deemed to have abandoned the child and to have waived any right to notice or a hearing. *See* Utah Code Ann. § 78–30–4(3)(a) to (c) (1977). The supreme court remanded the case to the trial court because it found that the putative father was not given an opportunity to show it was impossible for him to timely file his notice of paternity because of the mother's deception.[4] Therefore, to protect the father's due process rights, the court recognized an "impossibility" exception to the registration requirement, and held that the putative father "should be deemed to have complied with the statute" when "it [was] impossible for the father to file the required notice of paternity prior to the statutory bar, through no fault of his own," and "he came forward within a reasonable time after the baby's birth." *Ellis*, 615 P.2d at 1256.[5]

The 1990 law adopted and refined the *Ellis* "impossibility" exception. Under the new section 78–30–4.8, in order to be excused from the statutory bar, the law required a putative father who did not timely file his notice of paternity to establish three facts by clear and convincing evidence that:

> (a) it was not possible for him to file a notice of paternity within the period of time [before the child was placed with an adoption agency and before the adoption petition was filed];

---

4. The unwed biological mother and father were from California. About two weeks before the child was born, the mother came to Utah without telling the father where she was going, and arranged to relinquish custody of the child to the defendant adoption agency. The mother told the agency that she did not know who the father was. Two days after the mother relinquished her parental rights and custody of the child, the father's attorney contacted the agency and told it

that the father planned to assert his parental rights. Less than two weeks later the father filed his claim of paternity. *Ellis v. Social Servs. Dep't of the Church of Jesus Christ of Latter–Day Saints*, 615 P.2d 1250, 1252–53, 1256 (Utah 1980).

5. *See also In re Adoption of Baby Boy Doe*, 717 P.2d 686, 689–91 (Utah 1986) (reaffirming the *Ellis* "impossibility" exception).

(b) his failure to file a notice of paternity was through no fault of his own; and

(c) he filed a notice of paternity within 10 days after it became possible for him to file.

Utah Code Ann. § 78–30–4.8 (Supp.1990). The legislature took the language from *Ellis,* incorporated it into the first two elements of the statute, then identified ten days as the "reasonable time" period described in *Ellis* for the putative father to file his notice of paternity when the other two conditions are met.

Under the 1990 version of the law, as since 1975, only putative fathers who have properly registered their paternity claims are entitled to notice of their children's adoption proceedings. However, unlike under previous versions of the law, the 1990 law provides that once a putative father has registered and received notice, he may only argue the best interests of the child.[6]

The imposition of the "best interests of the child" standard received the greatest attention in the House and Senate debates of House Bill 56. Under previous law, once the putative father registered and established paternity, his consent was necessary, and he could effectively veto an adoption. Under the amended law, if a putative father registered, he could not veto an adoption but only could argue that the adoption was not in the best interests of the child. He was not elevated to the same status as the birth mother. This significant change was made because the task force found that a putative father's threats to register his paternity, aimed at the birth mother for whatever motive, would, in practical application, prevent the adoption because the birth mother would then likely be unwilling to place the child for adoption. *See* Tape of Utah House Floor Debates, 48th Legislature, January 15, 1990 (testimony of David McConkie made in Committee of the Whole). Thus, by amending the law so the unwed birth father no longer had the same legal right as the birth mother to veto the adoption, the legislature sought to encourage unwed mothers to place their children for adoption when the mothers felt it was in the best interests of their children so to do.[7]

Although it has not specifically approved the 1990 law, the Utah Supreme Court has justified the variations in constitutional protection accorded parents in different circumstances under prior law, stating:

> Parental rights are at their apex for parents who are married. Some variation exists among unwed fathers. While those who have fulfilled a parental role over a considerable period of time are entitled to a high degree of protection, unwed fathers whose relationships to their children are merely biological or very attenuated may, in some circumstances, be deprived of their parental status merely on the basis of a finding of the "best interest" of the child. In contrast, no similar variation exists among mothers who are unwed ...; all unwed mothers are entitled to a showing of unfitness before being involuntarily deprived of their parental rights.

*In re J.P.,* 648 P.2d 1364, 1374–75 (Utah 1982) (citations and footnotes omitted). In

---

**6.** However, under the law as amended in 1990, an unwed father's consent to his biological child's adoption *is* required, even if he has not filed his notice of paternity, when the following conditions are met:

(d) the biological father of an adoptee born outside of marriage ... proves that after the adoptee's birth he has:

(i) developed a substantial relationship with the adoptee and has taken some measure of responsibility for the adoptee and for the adoptee's future, and demonstrated a full commitment to the responsibilities of parenthood by participating in raising the adoptee; or

(ii) received the adoptee into his home, openly held out the adoptee as his own child, and otherwise treated the child as if it were his legitimate child.

Utah Code Ann. § 78–30–4.1 (Supp.1990). The willingness of a putative father to develop a substantial relationship with his child, or to receive the child into the putative father's home will not suffice. Only the actual accomplishment of these conditions qualifies for the treatment accorded by the statute, and meeting them is impossible under the facts of this case.

**7.** Since the putative father in this case did not register his notice of paternity, did not establish impossibility through no fault of his own, and did not file his notice of paternity within ten days after filing became possible, we do not reach the question of whether or not the 1990 law meets due process standards if a father has registered his notice of paternity and is then allowed only to argue the "best interests" of the child.

addition, the court has found that the state has a "legitimate and compelling interest" in adoption proceedings:

> The state has a strong interest in speedily identifying those persons who will assume the parental role over such children, not just to assure immediate and continued physical care but also to facilitate early and uninterrupted bonding of a child to its parents. The state must therefore have legal means to ascertain within a very short time of birth whether the biological parents (or either of them) are going to assert their constitutional rights and fulfill their corresponding responsibilities, or whether adoptive parents must be substituted.

*Wells v. Children's Aid Soc'y of Utah,* 681 P.2d 199, 203, 207 (Utah 1984); *see also Lehr,* 463 U.S. at 265, 103 S.Ct. at 2995, 77 L.Ed.2d 614 (noting the strong state interest in "facilitating the adoption of young children and having the adoption proceeding completed expeditiously").

Upon understanding the purposes intended by the legislature in the enactment and modification of the adoption statutes, it becomes evident that the trial court properly applied the law to the facts of this case.

## II. Appellant's Arguments Under Section 78–30–4.8

■ Mr. Royal advanced on appeal five arguments that we resolve by examining section 78–30–4.8. First, he argued that his consent was required for Baby Boy W's adoption. We disagree. Section 78–30–4.8 requires that a putative father file a notice of his paternity claim before "the child is relinquished to [an adoption agency] or prior to the filing of a petition by a person with whom the mother has placed the child for adoption." Utah Code Ann. § 78–30–4.8(2) (Supp. 1994). If the putative father does not file within this time frame, he is "barred from thereafter bringing or maintaining any action to assert any interest in the child unless he proves by clear and convincing evidence" that it was impossible, through no fault of his own, for him to timely file, *and* that he filed his paternity notice within ten days after it became possible for him to file. *Id.* § 78–

30–4.8(3). If the putative father does not file a timely paternity notice and does not meet the statutory "impossibility" exception, he is statutorily "deemed to ... waive and surrender ... any right to notice of any hearing in any judicial proceeding for adoption of the child, *and the consent of that person to the adoption of the child is not required.*" *Id.* § 78–30–4.8(4) (emphasis added).

Mr. Royal admits that he did not file his paternity notice either before the child was relinquished to the adoption agency or before the adoption petition was filed. Pursuant to the codified "impossibility" exception of section 78–30–4.8, he attempted to demonstrate that it was impossible for him to file before the child was relinquished to the adoption agency through no fault of his own. But Mr. Royal still did not file the notice of paternity within ten days after finding out that the child had been placed with an adoptive couple in Utah, as is required to take advantage of the "impossibility" exception. In fact, Mr. Royal did not file his notice of paternity for more than eight months after he was informed that the child was in Utah and was the subject of adoption proceedings here. Mr. Royal failed to comply with the requirements of section 78–30–4.8, and as a result of his failure, the trial court correctly concluded that Mr. Royal's consent to the adoption was unnecessary.

■ Next, Mr. Royal argued that section 78–30–4.8 does not preclude him from filing his objection to the adoption petition. On the contrary, section 78–30–4.8 explicitly provides that "any putative father who fails to file his notice of paternity is barred from thereafter bringing or maintaining *any action* to assert any interest in the child" unless he meets the statutory impossibility exception. *Id.* § 78–30–4.8(3) (emphasis added). Mr. Royal's objection to the child's adoption is an "action to assert [an] interest in the child." Therefore, because he did not register pursuant to section 78–30–4.8, he is explicitly barred from objecting to the adoption petition.

■ Third, Mr. Royal argued that this court should find that he substantially complied with the requirements of section 78–30–

4.8. However, substantial compliance with the statute is not enough. The Utah Supreme Court has held that requiring strict compliance with the adoption statutes is reasonable because of the nature of adoptions. *See Sanchez v. L.D.S. Social Servs.*, 680 P.2d 753, 755 (Utah 1984). For example, in *Sanchez*, the putative father lived in Utah throughout the pregnancy, knew of the time and place of the child's birth, but filed his notice of paternity one day late, although he had unsuccessfully tried to file the previous day. The court held that the putative father waived his parental rights because he had not strictly complied with the statute. As the court noted in that case, "[i]t is of no constitutional importance that Sanchez came close to complying with the statute. Because of the nature of subject matter dealt with by the statute, a firm cutoff date is reasonable, if not essential." *Id.* at 755; *see also Lehr v. Robertson*, 463 U.S. 248, 265, 103 S.Ct. 2985, 2995, 77 L.Ed.2d 614 (1983) ("The legitimate state interests in facilitating the adoption of young children and having the adoption proceeding completed expeditiously that underlie the entire statutory scheme also justify a trial judge's determination to require all interested parties to adhere precisely to the procedural requirements of the statute."). Mr. Royal needed to strictly comply with the requirements of section 78–30–4.8 to preserve his right to assert an interest in Baby Boy W. He failed to do so, and the trial court properly rejected his claim of substantial compliance.

■ Mr. Royal next argued that he fits within the exception to section 78–30–4.8. The only exception within the statute is the "impossibility" exception, codified in 1990. *See* Utah Code Ann. § 78–30–4.8(3)(a)–(c) (Supp.1994). Under section 78–30–4.8, even if the putative father can show by clear and convincing evidence that it was impossible, through no fault of his own, for him to file within the statutory time frame, he still must file his notice of paternity within ten days after it becomes possible for him to file. *Id.* Even under *Ellis* and *Baby Boy Doe*, which

created and applied the "impossibility" exception, the putative father is required to file his notice of paternity after it becomes possible for him to do so, within a reasonable time. The putative father in *Ellis* filed his paternity notice within a few weeks of learning of the child's birth, and in *Baby Boy Doe* the putative father filed his notice of paternity one day after he learned of the child's birth. *Ellis*, 615 P.2d at 1252–53; *Baby Boy Doe*, 717 P.2d at 688. Mr. Royal did not file his notice of paternity within ten days of finding out that Baby Boy W had been placed for adoption in Utah. He did not file his notice of paternity for more than eight months. As a result of this failure to timely file his notice, Mr. Royal forfeited the benefits of the statute.

■ Finally, Mr. Royal contended that his due process rights were violated by the process that terminated his parental rights. Again we disagree. The predecessors to the 1994 version of section 78–30–4.8, which were substantially similar to that section, repeatedly withstood due process challenges. The section has always been found to be constitutional on its face. *See In re Adoption of Baby Boy Doe*, 717 P.2d 686, 688–89 (Utah 1986); *Wells v. Children's Aid Soc'y of Utah*, 681 P.2d 199, 207 (Utah 1984); *Sanchez v. L.D.S. Social Servs.*, 680 P.2d 753, 755 (Utah 1984); *Swayne v. L.D.S. Social Servs.*, 761 P.2d 932, 940 (Utah App.1988), *aff'd*, 795 P.2d 637 (Utah 1990); *In re K.B.E.*, 740 P.2d 292, 294–95 (Utah App.1987). It has usually been found to be constitutional as applied. *See, e.g., Wells*, 681 P.2d at 207–08; *Sanchez*, 680 P.2d at 755; *Swayne*, 761 P.2d at 941–42. Only three cases have found the section to be unconstitutional as applied. Two of those cases, *Ellis* and *Baby Boy Doe*, established the "impossibility" exception to meet the demands of due process. As discussed above, section 78–30–4.8 was amended in 1990 to incorporate this exception as subsection (3). *In re K.B.E.* also found the statute unconstitutional as applied because the state's purpose was not met in that factual situation. In that case, the biological mother was not placing the child for adoption. *See In re K.B.E.*, 740 P.2d at 296–97.[8]

8. We do not reach the question of whether or not the 1990 law would pose due process problems on different facts than those presented here.

We hold that Mr. Royal's opportunity interest to establish his relationship with Baby Boy W was protected by the procedures of section 78–30–4.8. The requirement that Mr. Royal register his notice of paternity with the State of Utah within ten days after it became possible for him to do so, while short, is not impermissibly short. The state has a legitimate and compelling interest in "expediting the adoption of young children and in protecting the rights and interests of the child, the birth mother, and the adoptive parents," Utah Code Ann. § 78–30–4.8(3) (Supp.1994), and therefore may require that biological fathers, who are in the best position to protect their own rights, adhere strictly to the requirements of its adoption laws. If Mr. Royal had adhered to the requirements of section 78–30–4.8, he would have been entitled to notice of the adoption proceeding. Utah Code Ann. § 78–30–4.7(1)(b) (1992). However, he waived "any right to notice of any hearing in any judicial proceeding" of the adoption of Baby Boy W when he failed to comply with section 78–30–4.8. Utah Code Ann. § 78–30–4.8(4) (Supp. 1994).[9]

### III. Comity

■ Mr. Royal argues that the trial court, as a matter of comity, should have waited until the Indiana court ruled on his paternity claim before it proceeded with the adoption.

We disagree. "The decision to apply comity in a particular case is fact sensitive. Therefore, courts have consistently found that the decision to apply comity rests within the sound discretion of the trial court." *Jackett v. Los Angeles Dep't of Water & Power,* 771 P.2d 1074, 1075 (Utah App.1989). In the case of Baby Boy W, the Indiana court could not have exercised any jurisdiction over Baby Boy W, the adoptive parents, or the adoption proceedings. As such, the Utah trial court properly exercised its discretion in declining to defer to the Indiana paternity action filed by Mr. Royal. Delay of the adoption proceeding in Utah while Mr. Royal's paternity action was adjudicated in Indiana would have had no effect on the outcome of the adoption proceeding, other than to delay it.

### IV. Duress

■ Mr. Royal also argues that the biological mother's relinquishment of parental rights and consent to the adoption should be set aside on the grounds that she did so under duress and undue influence. Mr. Royal has no standing to raise the issue, and we decline to address it. *See* Utah R.Civ.P. 17(a) ("Every action shall be prosecuted in the name of the real party in interest.").

### V. Uniform Child Custody Jurisdiction Act

Appellant conceded at oral argument that the Uniform Child Custody Jurisdiction Act,

---

**9.** Notably, the Utah Legislature passed a new adoption act during the last legislative session. *See* Utah Legislative Report 1995, S.B. 101. This new act repealed, among other statutory provisions, section 78–30–4.8, and enacted sections 78–30–4.12 to 78–30–4.17. *Id.* These newly-enacted sections contain legislative findings that the state, an unmarried mother, adoptive children, adoptive parents, and unmarried biological fathers all have interests in an adoptive proceeding. *See* Utah Code Ann. § 78–30–4.12(2) (Supp. 1995). These different and sometimes conflicting interests must be balanced. *See* Tape of Utah Senate Floor Debates, 51st Legislature, February 14, 1995 (explanation made by Janetha Hancock, Legislative Staff Attorney, in Committee of the Whole). Under the statute, the legislature finds that "the interests of the state, the mother, the child, and the adoptive parents ... outweigh the interest of an unmarried biological father who does not timely grasp the opportunity to establish and demonstrate a relationship with his child in accordance with the [statute's] requirements." Utah Code Ann. § 78–30–4.12(3)(c) (Supp.1995). The unmarried biological father's interest, unlike

the other parties' interests, is an "inchoate interest" and "acquires constitutional protection only when he demonstrates a timely and full commitment to the responsibilities of parenthood, both during pregnancy and upon the child's birth." *Id.* § 78–30–4.12(2)(e). Therefore, under the 1995 laws, an unmarried father is entitled to notice of his biological child's adoption proceedings only if he has strictly complied with the statute. *See id.* §§ 78–30–4.12(3)(a) & (b), 78–30–4.13, 78–30–4.14(1)(d) to (f), –4.14(2) to (5). In addition, the legislature has found that there is "no practical way to remove all risk of fraud or misrepresentation in adoption proceedings," but that it has provided a statutory way for biological fathers to have their rights absolutely protected through the process of registering their paternity, so the burden of complying with the statute and "ameliorat[ing] the effects of fraud" are upon the father. *Id.* § 78–30–4.15(3). However, the legislature has provided an exception to the statutory requirements that is similar to the "impossibility" exception. *See id.* § 78–30–4.15(4).

codified at sections 78–45c–1 to –26 of the Utah Code, is inapplicable in this case; therefore, we do not address this issue.

## CONCLUSION

Under sections 78–30–4.1 and 78–30–4.8 of the Utah Code, Mr. Royal's consent to the adoption of Baby Boy W is not required, and Mr. Royal is precluded from filing an objection to the proposed adoption. Section 78–30–4.8, as applied in this case, does not violate Mr. Royal's constitutionally protected rights to due process under either the United States Constitution or the Constitution of Utah. The legislature has provided an opportunity for putative fathers to file a notice of paternity within ten days after it becomes possible for them to do so, and Mr. Royal failed to exercise that right. In so doing, he waived his rights to participate further in the adoption of Baby Boy W.

The judgment of the trial court is affirmed in all respects. Costs on appeal are awarded to appellees, with each party to bear its own attorney fees.

DAVIS, Associate P.J., and BILLINGS, J., concur in the result.